UNITED STATES of America,
Plaintiff-Appellant,

v.

Larry S. GLIST, Ronald L. Phares, Larry M. Senderhauf, and Robert W. Simon, Defendants-Appellees.

Nos. 77–1485, 77–1486, 77–1487 and 77–1488.

United States Court of Appeals, Tenth Circuit.

Submitted May 10, 1978.

Decided March 28, 1979.

Richard S. Vermeire, Asst. U. S. Atty., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., with him, on brief), for plaintiff-appellant.

Michael J. Abramovitz of Drexler & Wald, Denver, Colo., argued, for defendants-appellees Larry S. Glist and Ronald L. Phares and on brief, for defendants-appellees.

Marvin J. Garbis and Stephen C. Struntz of Garbis & Schwait, Baltimore, Md., on brief, for defendants-appellees.

Charles H. Foster, Denver, Colo., argued for defendant-appellee Larry M. Senderhauf.

Before McWILLIAMS, BREITENSTEIN and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

The United States brought this appeal under 18 U.S.C. § 3731 when the trial court dismissed, after five days of trial, its conspiracy count in an indictment against the defendants-appellees.

The questions on appeal are whether the constitutional guarantee against double jeopardy bars the government's appeal and retrial of defendants on the conspiracy charge, and whether the trial court erred in dismissing the conspiracy count for prein-

dictment delay and in declaring a mistrial on one count of filing a fraudulent tax return.

Count I of the indictment charges defendants-appellees Larry S. Glist, Ronald L. Phares, Larry M. Senderhauf and Robert W. Simon with conspiracy to violate the tax laws of the United States, under 18 U.S.C. § 371. Appellee Glist remains charged in counts II and III with his wife for willfully filing fraudulent individual income tax returns in 1971 and 1972, in violation of 26 U.S.C. § 7201. Glist also remains charged in counts IV and V for willfully filing fraudulent corporate income tax returns in 1971 and 1972, but the 1971 charge was severed before trial and a mistrial was declared as to the 1972 charge when the conspiracy count against all defendants was dismissed.

Most of the government evidence presented at trial relevant to the conspiracy consisted of testimony by several former franchise owners and employees who attended a 1972 business meeting of Homefinders, Inc., a rental service agency established by defendants in the early 1970's. Most witnesses were in their mid-twenties and had worked in various capacities for local Homefinders offices throughout the United States.

The witnesses testified that at a September 1972 meeting in Florissant, Colorado, attended by all defendants and several Homefinders franchise owners, there was considerable discussion about setting up a scheme to understate franchise income. Defendants were said to have promoted a recordkeeping system that would divide the rental policies into two categories so one-half of the business records could be destroyed if the office was audited by the Internal Revenue Service (IRS). The scheme involved remitting one-half of the franchisee's contractual obligations owed the franchisor in nontraceable cash or money orders and the other half by check. Discussions even focused on the best methods for holding the excess cash local offices

would not place in their personal or business bank accounts to avoid an IRS audit. The entire scheme was designed to understate franchise income by exactly one-half with the intention to greatly cut franchisor and franchisee tax liability.

Testimony declared franchisees were encouraged to use photo mailers to send cash to the Denver home office for protection against theft; Denver monthly production reports understated the total Homefinders system income by exactly one-half and included a formula prepared by one franchisee to accurately compute company volume from the understated production reports; franchisees were told to claim their employees were independent contractors to avoid withholding taxes; and Simon was given responsibility for hiring bookkeepers who would overlook the scheme for those franchisees unable to find one. Written and tape-recorded notices and instructions were sent to franchisees containing instructions dealing with tax evasion techniques.

The witnesses said the scheme was in effect from the September 1972 Florissant meeting until an April 1973 meeting in Lake City, Colorado, when "everybody decided to clean up their act and go straight." The defendants announced the scheme would be discontinued because, according to Simon, it was inevitable they would get caught since the organization had grown to almost 50 offices around the country, and unanimous compliance had not been forthcoming. A transcript of a taped discussion held at the April 1973 meeting was provided in the government's supplemental bill of particulars and details the considerations Homefinders' participants gave to discontinuance of the tax-evasion scheme.

Shortly after the indictment was filed against the defendants, counsel submitted motions to dismiss the indictment for preindictment delay because more than three years had elapsed between the government investigation and indictment. The trial judge took these motions under advisement, and as the trial developed counsel argued

for dismissal, but the court denied those requests to allow the government to develop its case.

Throughout the trial the court held morning sessions outside the presence of the jury to resolve various questions undecided when the trial began and which developed during the trial. These hearings became more complicated as the week developed and potentially exculpatory material under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), surfaced on several tapes the government had in its investigative files, and prior statements falling under the Jencks Act, 18 U.S.C. § 3500, were discovered.

On the fourth day of trial, several government witnesses employed in Canadian and United States banking institutions that handled accounts for Homefinders, Inc. and Larry Glist began detailed testimony about large cash deposits and withdrawals from those accounts. The fifth trial day began to focus on testimony from IRS agents that investigated the case, relating both to the alleged conspiracy and fraudulent corporate income tax returns, but the hearings outside the presence of the jury clearly were the focus of the government's troubles.

When the court adjourned after a week of testimony, counsel were instructed to prepare for argument the following Monday on their motions to dismiss. At that hearing extensive argument was presented with respect to many tapes held in the government files until during the trial, containing allegedly exculpatory statements by various defendants. There was also testimony taken of a government agent who cut off transcription of one series of tapes immediately prior to an exculpatory statement by one defendant.

After counsel argued their motions, the trial judge characterized the situation as follows:

The primary issue for me to deal with right here and now is whether a fair trial is going on.

It is clear in my mind that it is not and the trial must be terminated. There is no question that we cannot go back and reconstruct enough of this case in front of this jury to make it a fair trial.

Other conclusions of the judge are discussed below.

No further testimony was taken, the defendants were exonerated of their bonds, the conspiracy count was dismissed and a mistrial was declared on the count of fraudulent filing of the 1972 Homefinders, Inc. corporate tax return against Larry Glist. The government appealed this decision under 18 U.S.C. § 3731.

The necessary starting point for our analysis is *United States v. Scott*, 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978), decided while this case was pending on appeal. *Scott* ruled that "where the defendant himself seeks to have the trial terminated without any submission to either judge or jury as to his guilt or innocence, an appeal by the Government from his successful effort to do so is not barred by 18 U.S.C. § 3731." *Id.* at 101, 98 S.Ct. at 2199. It also overruled *United States v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), which would have permitted no appeal from a termination after the trial had actually commenced, if there was any possibility of retrial.

 Thus the appeal by the government is permissible unless double jeopardy has attached.[1] When the court declared a mistrial on Count V, concerning the corporate tax return for 1972, double jeopardy did not attach because the court clearly did not rule on the merits of that claim. The judge expressly stated that he did not intend to dismiss that count. As to Count I, the

---

1. As pertinent here, 18 U.S.C. § 3731 provides: "In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution."

conspiracy charge, the dismissal after five days of trial, in light of the statements of the trial judge, raises serious questions whether double jeopardy would apply to this dismissal, but we do not discuss that issue because of our holding on preindictment delay.

As noted above, the trial judge orally reviewed the relevant considerations to determine "whether a fair trial is going on," and determined it was not. He states, "The real question is whether this case should be declared a mistrial or a dismissal." He noted that the "whole series of events" had been before him in a prior civil trial between the parties where he had ruled for the government. He then recited he had reserved ruling on Fourth Amendment violations involved in the undercover operation, Fourth Amendment violations and fraud on the court involved in obtaining a search warrant, and abuse of power given by Congress in the authority to issue administrative summons. The judge declared there were *Brady* and Jencks Act questions which had arisen in the trial, emotionalism displayed at the trial, immunity witnesses "whose testimony was granted with caution and weighed with care," and a pattern of conduct in which the Internal Revenue laws were not consistently and evenly enforced with respect to the people who were participants as witnesses and parties in the case. He mentioned that defense counsel had urged dismissal on the basis of government misconduct from time to time, then continued:

But overriding all of this, we have had the question of whether or not due process is unavailable in this case because of the long delay in the indictment.

That's an issue that I have wrestled with before, in other cases, and other conduct, and it's never been very clear to me, as a matter of the Appellate Court precedents, exactly where the Court can step in, a trial court, in saying there has been such prejudice as a result of the pre-indictment delay that no trial, no fair trial is now possible.

Considering all that has happened since we have started this matter and particularly in the trial of the criminal case, I think I have now come to understand when pre-indictment delay is so prejudicial that no trial can be conducted.

I suppose, like the famous phrase with respect to obscenity, you have to have great difficulty in attempting to define it, but you know it when you see it.

I have seen it in this trial.

It's a combination of many things. And I do not, by this, agree with the implicit characterizations of misconduct which have been made in this courtroom. I have not conducted the trial of the Government here. I have attempted at all times to stay with the issues.

But it does seem clear to me that this is a shambles of a trial and it will be again if the case goes to trial. The witnesses, young people, very young at the time of the offense, have very poor recollections with respect to what did or did not occur.

We have had the Government's investigative files scattered among many people and offices.

We have got a lead agent who is no longer with Internal Revenue Service, and it seems to me we have not had the kind of disciplined development of the facts that is required.

Now, here again I am not and do not wish to anyone, to be understood by anyone at making the criticism of Mr. Vermeire, Mr. Messinger, Mr. Kilpatrick, Mr. Gehres or any other agent.

I have not heard it all with respect to what happened. What I have heard has convinced me that no citizen of the United States should be required to answer in a criminal courtroom to charges that are stale as these charges with conspiracy as broad in scope as has been charged here. And that to compel such a trial is a denial of the constitutional rights of the accused.

Accordingly, I am at this point in time entering an order of dismissal of all of

Count I of the indictment with respect to all defendants.

We have in the course of the trial also been trying Court [sic] V with respect to the defendant Larry S. Glist. With respect to that Count, I grant the motion for mistrial and do not dismiss.

■ Thus the trial judge based his dismissal of Count I on preindictment delay. To uphold that determination the record must demonstrate that there was prejudice to the defendants because of the delay. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The record, reviewed in the trial judge's recital above, amply supports a finding of prejudice. But more is required; *Lovasco* says, "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." 431 U.S. at 790, 97 S.Ct. at 2049. We have construed those cases to require more than ordinary negligence on the part of government representatives. *See United States v. Radmall,* 591 F.2d 548 (10th Cir. 1978); *United States v. Revada*, 574 F.2d 1047 (10th Cir. 1978).

■ Despite statements made by the judge to the jury and counsel defending the government prosecutors, we construe his remarks to find fault with the governmental agents' handling of the investigation and the prosecution of this case. He stated this was a "shambles of a trial," the government investigative files were scattered among many people and offices, the IRS lead agent was no longer with the government and there was not "the kind of disciplined development of the facts that is required." At various times in the trial he found Jencks Act and *Brady* violations. Government agents had not listened to tapes which arguably contained exculpatory statements by defendants, and these had been represented to defense counsel and to the court as duplicates of tapes which contained no such material. The incident which seemed to precipitate the court finally granting the motion to dismiss due to preindictment delay involved the government providing tape recordings of the company meeting where the tax fraud scheme was discussed together with a written transcript which purportedly contained all pertinent remarks made at the meeting about the conspiracy. After five days of trial it was revealed that a government agent had cut off the transcription 82 seconds before a clearly exculpatory statement by one of the defendants.

Our examination of the record demonstrates that while there may have been no deliberate intention on the part of government agents to deceive, there was substantial fault by government representatives, enough to support dismissal for preindictment delay under the standards of *Lovasco* and *Marion*.

The judgment of the trial court is affirmed.