**UNITED STATES of America**

v.

**Stuart SABATH.**

**No. 97 CR 110.**

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 12, 1998.

---

Matthew E. Kennelly, Terence H. Campbell, Cotsirilos, Stephenson, Tigne & Streicker, Chicago, IL, Alan D. Blumenthal, Blumenthal and Associates, Northbrook, IL, for Stuart L. Sabath.

1.  Pursuant to our discretion as the ultimate arbiter of the facts, the "relevant facts" section constitutes our formal findings of fact on the issue of preindictment delay.

2.  In 1991, the statute of limitations for arson was five years. In 1994, while the government still had two years remaining on the original statute

George Jackson, III, U.S. Attorney's Office, Chicago, IL, for U.S.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This is a highly unusual criminal case. The defendant Stuart Sabath ("Defendant") is charged with burning down his own former place of business on July 31, 1991. Unfortunately, the charge is not what is extraordinary about this case. In the usual criminal prosecution, any blunders in the investigating agents' initial investigation are ameliorated by the prosecuting attorney. What happens when deficiencies in the initial investigation are instead prejudicially aggravated by the prosecuting attorney's needless delay in securing an indictment? That is the situation in this peculiar case, where the government recklessly delayed in bringing highly circumstantial arson and related mail fraud charges against Defendant until February 19, 1997—even though by the government's own admission the investigation was completed over four years earlier.

### Relevant Facts[1]

On February 19, 1997, a grand jury returned a four-count indictment against Defendant charging arson and related mail fraud counts stemming from a fire that destroyed Defendant's place of business on August 1, 1991. On March 6, 1997, Defendant entered a not guilty plea to all four counts. On April 1, 1997, the Court set an initial trial date of May 19, 1997.

On April 16, 1997, defendant's original counsel filed a motion to dismiss the indictment for prejudicial preindictment delay, and a separate motion to dismiss Count IV of the indictment on statute of limitations grounds. On May 28, 1997, the Court denied both of these motions. The Court concluded that Count IV of the indictment was within the outer boundaries of the applicable statute of limitations. (See 5/28/97 Tr., pp. 2–5).[2] De-

of limitations, Congress increased the statute of limitations for arson to seven years. In 1996, it was further increased from seven to ten years. Extension of a statute of limitations before a given prosecution is barred does not violate the ex post facto clause. See United States ex rel. Massarella v. Elrod, 682 F.2d 688 (7th Cir.1982).

fendant's motion to dismiss for prejudicial preindictment delay was dismissed without prejudice to its future renewal because of counsel's failure to specify the prejudice Defendant had suffered. (*See* 5/28/97 Tr., pp. 2–5).

At Defendant's request, his trial was continued on two occasions so that he could adequately prepare for trial and because of his counsel's serious illness. On August 22, 1997, defendant's new and present counsel filed an appearance and began to prepare for trial. Because of the complexity of this circumstantial for-profit arson case, the Court reset it for trial on January 5, 1998, to allow defendant's new counsel adequate preparation time and to accommodate all of the attorneys' schedules.

On December 10, 1997, Defendant renewed his motion to dismiss for prejudicial preindictment delay. This Court orally granted the motion on January 5, 1998, after receiving extensive oral and written submissions from the parties and holding an evidentiary hearing. This opinion will set forth the reasons for the Court's dismissal of the indictment.

### Defendant's Renewed Motion To Dismiss Indictment For Prejudicial Preindictment Delay

█ The difference between the earlier motion to dismiss for preindictment delay, which the Court dismissed without prejudice, and the renewed motion is like the difference between night and day. Unfortunately, despite this Court's express warnings, the government continued to treat the renewed motion as inconsequential and overlooked its seriousness. (*See* 12/17/97 Tr. pp. 4–5, 12).[3]

Defendant's renewed motion expressly and vividly details the extreme and compound prejudice Defendant suffered because of the government's unexplained delay in securing an indictment. This renewed motion outlines the following uncontested facts. Immediately after the fire at Stuart Eddy Imports on July 21, 1991, Bureau of Alcohol, Tobacco & Firearms ("ATF") Special Agent Mirocha and some state agents interviewed the only persons known to be on the premises, Defendant, who was fifty-seven years old, his seventy-eight-year-old father, Eddy Sabath, and an employee named David Hen. By August 1991, the government's investigation had progressed rapidly. The government had obtained a signed statement and sworn grand jury testimony from its primary fact witness, David Hen; executed at Defendant's residence a search warrant that uncovered documentary evidence the government planned to use at trial; put together a physical and scientific cause and origin evaluation concluding that the fire was intentionally set using an accelerant; and secured statements of other potential witnesses. By March 1992, the government also had obtained Defendant's extensive sworn statement given to an insurance company attorney.

This factually uncontested motion established severe, substantial and actual prejudice to Defendant. In the first instance, not surprisingly, the memory of the key fact witness David Hen had faded considerably. Other than Defendant and his father, Hen was the last person at the scene of the fire. By the time the government got around to bringing an indictment, David Hen had voluntarily moved from the United States to the Netherlands. Since he apparently was a reluctant witness, the Court granted the government's motion to proceed with his deposition to preserve his testimony over the objection of Defendant. On the eve of trial, the government moved to admit portions of his deposition because of his unavailability. The Court's review of Mr. Hen's deposition

---

3. The government's handling of the prejudicial preindictment delay issue has followed a pattern that has dominated the government's entire investigation and prosecution of this case—a consistent "too late/too little" approach. This approach is further confirmed by the government's raising new arguments, based on facts that were available before the December 31, 1997 evidentiary hearing, as well as two new affidavits prepared after this Court's January 5, 1998 oral ruling, in a thirty page "Petition for Reconsidera-

tion"—which the government attempted to file after normal business hours during the very weekend the Court was finalizing this opinion. The Court reviewed and considered this extensive petition, which contains very little analysis of relevant law, before issuing this opinion. The government's undated and untimely petition is hereby denied without prejudice to its renewal once the government at least takes the time to review this opinion, which the Court clearly and expressly stated it would issue by today's date.

reveals his diminished memory on many key circumstantial facts.

Second, the government lost crucial evidence. After the fire, ATF investigators apparently found a gallon can containing some liquid in the service area of the dealership—the apparent point of the fire's origin. The can was chemically tested and determined to contain certain liquids that could have been accelerant. It is uncertain whether the government could have recovered fingerprints. In any event, Defendant successfully obtained a court order to inspect and test the can. Inexplicably, however, the can is missing and not available for Defendant's inspection or testing. This Court tried to eliminate the prejudice to Defendant by granting his motion *in limine* to bar any reference to the can. The government requested the Court to reconsider this ruling despite the fact that it continues to rely on the ruling to assert that Defendant suffered no prejudice. But excluding reference to the can would not eliminate all the prejudice because merely excluding any reference to the can does not allow Defendant to test it.

The can is only one among many items of evidence lost during the government's delay. Prints and negatives of the photographs of the fire, as well as a videotape of the fire's progress, are lost. In most criminal cases this would not be severely prejudicial; however, in a close circumstantial arson case these are key pieces of evidence.

Finally, not one, but a total of three important witnesses have died during the government's delay in indicting this case. Not surprisingly, even given today's longer life spans, Defendant's father—the only person with Defendant right before the fire—died of natural causes on January 13, 1994, at the age of 80. Eddy Sabath had suffered from a heart condition for many years, a fact that is documented in the government's investigative case report dated November 12, 1992. (*See* Ex. 5 from 12/31/97 hearing).

When Defendant's original counsel raised the issue of the Eddy Sabath's death as a *per se* reason justifying dismissal because his testimony "would be of critical importance," the Court denied the motion without prejudice on the grounds that defendant had not met his burden of establishing: (a) what Eddy Sabath's testimony would have been; and (b) that the testimony would not be admissible at trial. (*See* 5/28/97 Tr. pp. 2–5).

The pleadings accompanying Defendant's renewed motion remedied these deficiencies. In support of his renewed motion, Defendant submitted recently discovered statements of his father, as well as his own affidavit, which summarized his father's potential testimony. Unfortunately, the written statements of Eddy Sabath leave a great deal to be desired from an investigative, truth-seeking standpoint. None of the statements discloses what Defendant and his father were doing during the critical time period when the fire was presumably set. (*See* 12/31/97 Tr., Exs. 1–3). The only relevant facts on this critical issue are contained in two short paragraphs:

> [Eddy] Sabath states that on the night of the fire there were no other employees working at the dealership. This also included any porters or office help.

> Sabath stated that he checked the back service area at around 8:45 p.m. and that everything appeared in order. Shortly after, he was near the door leading into the service area when the door was blown open knocking him down. He also said there was also a "crazy noise," and agreed that it sounded like "whooshing". Sabath then stated although being knocked down and hearing the noise that came from the service area, he did not attempt to investigate its source.

(12/31/97 Tr., Ex. 1). The report then abruptly changes topics and fails to mention any further relevant information about either of the Sabaths' activities on the night of the fire. (*Id.*)

Over persistent objections by the government, this Court attempted to explore the possibility of curing the prejudice from Eddy Sabath's death by admitting his statements under the catch-all hearsay exception clause. *See* Fed.R.Evid. 804(5). However, it is evident to the Court that the poor quality of all the written statements taken from Eddy Sabath on July 31, 1991 are severely flawed, making these statements totally useless to Defendant.

The Court concludes on the basis of all the evidence presented that Eddy Sabath, if

alive, would have provided critical testimony for Defendant in this circumstantial case. After reviewing Special Agent Mirocha's testimony, his notes, his formal interview report, sworn statement and affidavit of Defendant, the Court concludes that Eddy Sabath would have credibly testified that Defendant did not have an opportunity to start the fire on July 31, 1991. This testimony would naturally have been attacked as biased, yet this Court has seen many family relatives testify effectively, believably and sincerely on behalf of close family members. There is no reason to conclude that Eddy Sabath's septuagenarian testimony would not be believable or effective. In fact, at the December 31, 1997 evidentiary hearing, Special Agent Mirocha testified he did not form any opinion as to the truth or falsity of Eddy Sabath's statement on July 31, 1991. (12/31/97 Tr., p. 32).

The second critical deceased witness is Emmanuel Brunious, an employee of Stuart Eddy Imports who was working on the day of the fire. He also died in June 1997, from cancer, after his illness became aggravated in February 1997. At the scheduled trial, the government was prepared to assert that Defendant purposely sent Brunious home early on the night of the fire. But ATF's interview of the late Mr. Brunious provides a legitimate explanation for his early departure on the night of the fire. Mr. Brunious indicated that he decided to begin work early on his own accord; to compensate, he went home earlier than usual. The government would also have tried to establish through Brunious a financial motive for Defendant to burn down his own business. But Brunious told an insurance investigator on August 5, 1991 that Defendant's business had been good at times and was on an upward trend. (Def.'s Renewed Mot., Exs. 5, 6 and 7). The Court concludes that Defendant irretrievably lost this favorable testimony as a result of the government's unreasonable delay when Mr. Brunious became critically ill in the early part of 1997. The Court also finds that Mr. Brunious' testimony would have been credible and potentially dispositive in this close case.

The last deceased witness critical to Defendant's defense was the ATF case agent assigned to this case, Special Agent Jack Stieman. He took Mr. Brunious' statement on November 14, 1991, as well as the statements of numerous other witnesses, and authored the case report dated November 12, 1992. (12/31/97 Tr., Ex. 5). But Agent Stieman is no longer available to be called as an adverse witness to establish any of the numerous facts concerning the adequacy of the government's initial investigation. Given Special Agent Mirocha's poor memory and his deference to Stieman as the case agent, the loss of Special Agent Stieman is significant. (12/31/97 Tr., pp. 13, 54). The Court's experience with these cases indicates that juries often find admissions by investigating agents to be dispositive in close cases.

### The Government's Response To The Defendant's Renewed Motion

On December 19, 1997, the government filed its response to Defendant's renewed motion to dismiss the indictment for prejudicial preindictment delay. The government's response conceded that it could have indicted this case sooner, but argued that Defendant had not established prejudice. The government asserted that Eddy Sabath would not have appeared credible because he was attempting to shield himself from criminal culpability. The government also asserted that Mr. Brunious' testimony was lost because of Defendant's continuance of the earlier May 1997 trial date, not preindictment delay. This Court squarely rejects the government's attempt to blame Defendant for the prejudice caused by its long, unexplained delay in indicting this case.

Pivotal on this point is the fact that the government conceded that its "investigation of this case was complete by June 1992" and that it had received "the case file [report] in December 1992."[4] (Govt's Resp. to Renewed Mot., p. 9). Yet the government asserted that because it did not *intentionally* delay seeking an indictment to gain a tactical advantage, Defendant's renewed motion should be denied.

---

4. Given this clear admission, the Court has determined that the government bears responsibility for all the prejudice Defendant suffered. That prejudice is reviewed extensively in this opinion.

### *The December 31, 1997 Evidentiary Hearing*

The December 31, 1997 evidentiary hearing also vividly established the actual, non-speculative prejudice Defendant suffered because of the preindictment delay in this case. Defendant called only one witness to testify. The government declined to place any testimony into the record.

The sole witness was Special Agent John Mirocha, a twenty-year veteran of the ATF. (12/31/97 Tr. p. 11). Special Agent Mirocha was the only federal agent who questioned the persons present at the scene of the fire in 1991. He testified that he was assigned to investigate a suspicious fire that occurred on July 31, 1991 at the Stuart Eddy Imports car dealership, which was owned by Defendant. (*Id.*, pp. 11, 16; Ex. 1). The main case agent assigned to this case was Agent Jack Stieman, who died prior to the indictment. (*Id.*, p. 13). Throughout the hearing, Agent Mirocha made it repeatedly and abundantly clear that he had no independent memory of the key events on the night of the fire and that his recollection was based entirely on his rough handwritten notes. Special Agent Mirocha first found these notes at 7:00 a.m. on the morning of the evidentiary hearing, after this Court ordered them produced to Defendant. (*Id.*, p. 49). Inexplicably, Special Agent Mirocha did not reduce his handwritten notes to formal reported statements for six months. (*Id.*, pp. 23–24). At that point, in February 1992, now-deceased Special Agent Stieman was in the midst of preparing his formal case report, which is dated 11/12/92 and was admitted as Exhibit 5. (*Id.*, p. 42). Other than the items contained in his sketchy notes and formal reports derived from those notes, Special Agent Mirocha had no recollection of his investigation on the night of the fire. (*Id.*, pp. 22, 26, 50–51). Special Agent Mirocha also made it clear that a report prepared by a fellow state investigator, Mickey Zito, did not refresh his recollection on any relevant matters. (*Id.*, pp. 34–36, 51).

Special Agent Mirocha's interviews of the only three persons at the scene of the fire—Defendant, his father, Eddy Sabath, and David Hen—were documented in Exhibits 1 and 2. Special Agent Mirocha made it clear that he attempted to write down all important incriminating evidence in his notes and resulting report. (*Id.*, pp. 56–57). But Special Agent Mirocha had no independent memory of asking Eddy Sabath where Defendant was the entire evening of the fire. (*Id.*, p. 58). In fact, Agent Mirocha responded to questions from the Court in the following manner:

> THE COURT: So let me make sure I have this straight. That day, you get to the scene of a suspicious fire. You're basically told that there were only three persons at this auto sales dealership, right?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: And as you sit here today, you don't have any knowledge of asking each of those three persons what the other persons were doing that particular evening right before the fire started?
>
> THE WITNESS: That's correct.

(*Id.*, p. 59).

At the conclusion of the December 31, 1997 hearing, the Court again requested that the government detail all its investigative activity in this case after 1992. (*Id.*, pp. 64–65). The Court even invited the government to file any investigatory materials on an *in camera* basis, over Defendant's strenuous objection. In short, the Court gave the government a continuing opportunity to make its record in this case and to explain the reasons for its delay. However, the government failed to take advantage of this opportunity. (*Id.* pp. 64–65; 1/5/98, pp. 1–14).[5]

On the basis of the uncontested factual record, the Court concludes that Defendant established actual, substantial prejudice from the government's non-investigative delay in obtaining an indictment in this case. The Court does not rely on any one single piece of evidence or testimony that became unavailable. Instead, the Court finds that the combination of deceased key witnesses, memory-impaired witnesses, and missing evidence prejudiced severely Defendant's ability to de-

---

5. The government's failure to make any record on the need for investigative delay is a striking admission in light of this Circuit's clear requirement, detailed on page 13, making it *mandatory* to explain the reasons for delay once the Court has found prejudice.

fend this circumstantial arson-for-profit case. Furthermore, the Court concludes that the memory-impaired witnesses were attempting to rely on flawed government reports for purposes of giving trial testimony. Having found substantial prejudice as a factual matter, we now turn to the legal standards governing due process violations on the basis of preindictment delay.

### Legal Standards

The Supreme Court last addressed the issue of preindictment delay over twenty years ago in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). In *Lovasco*, Justice Marshall rejected the defendant's assertion that an eighteen-month delay between the time of the alleged offenses and indictment violated the Constitution. The Court noted that its earlier opinions had made it clear that legislatively enacted statutes of limitations provide the primary and predictable guarantee against overly stale criminal charges. 431 U.S. at 783 (citing *United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). Yet both the *Lovasco* and *Marion* opinions acknowledged that a statute of limitations does not fully define defendants' preindictment rights, and that the Due Process Clause plays at least a limited role in protecting against oppressive delay. *Lovasco*, 431 U.S. at 783; *Marion*, 404 U.S. at 324. *Lovasco* also clarified that proving prejudice because of preindictment delay makes a due process claim only concrete and ripe for adjudication, not automatically valid. 436 U.S. at 783. For example, the Court explained, prosecuting a defendant following "investigative delay" does not deprive him of due process even if his defense might have been somewhat prejudiced by the lapse of time. But Justice Marshall limited the Court's holding in *Lovasco* to its facts and expressly acknowledged that it would be up to the lower courts to apply due process principles to the particular circumstances of individual cases. 431 U.S. at 783.

Most importantly, for purposes of this case, Justice Marshall noted that the government had expanded its prior concession in *Marion*, that a "tactical" delay would violate the Due Process Clause, by acknowledging that "a due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances known to the prosecution suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." *Lovasco*, 431 U.S. at 795 n. 17.

The law in the Seventh Circuit gradually evolved after *Lovasco*. The Seventh Circuit has yet to review a case, such as this one, that meets the acknowledged dual standards of (1) actual prejudice and (2) government fault. This Court has reviewed every single Seventh Circuit opinion that has analyzed the issue of preindictment delay. Most of these cases are not helpful because, just like search and seizure cases, they turn on the individual circumstances presented in each case. Moreover, most of the cases involve circumstances, unlike this case, where the defendant failed to establish actual prejudice because of the government's delay. The most important principles emerge from the Seventh Circuit's 1994 decision in *United States v. Sowa*, 34 F.3d 447, 450–52 (7th Cir.1994).

In *Sowa*, the Seventh Circuit finally reviewed a case where the defendant was able to establish "actual and substantial prejudice" from a preindictment delay in the district court. Defendant Sowa was indicted in November 1992 on federal civil rights charges for a racially motivated beating—over four years after the alleged offense. The federal investigation did not begin until Sowa was acquitted on related state charges in February 1990. Judge Bauer held that the district court did not abuse its discretion in finding that this delay resulted in actual and substantial prejudice. The prejudice stemmed from Sowa's inability to assist in his own defense due to his deliberate alcohol and drug abuse during the intervening years.

Judge Bauer explained that "once the defendant has proven actual and substantial prejudice, the *government must come forward* and provide its reasons for the delay. The reasons are then balanced against the defendant's prejudice to determine whether the defendant has been denied due process.... [A]s indicated by *Lovasco*, if the cause of the delay is legitimately investigative in nature, a court will not find a due process violation." 34 F.3d at 450 (emphasis added).

The application of the *Lovasco* balancing test led to the easy conclusion that legitimate investigative reasons justified the prejudicial delay. The Court held:

> Obtaining evidence against Sowa was exceptionally difficult given that virtually all of the witnesses were friends of Sowa. Once the government identified a reliable witness, however, they completed their investigation, and the grand jury returned an indictment within ten months. The Supreme Court unequivocally approved a delay for further investigation in *Lovasco*. Considering that the prejudice to Sowa was at least partially a consequence of his own behavior and the strength of the government's reasons for the delay, we agree with the district court that Sowa suffered no due process violation.

34 F.3d at 451.

*Sowa* represented a significant development in the Seventh Circuit—it was the first decision to engage in the balancing process. *See United States v. Canoy*, 38 F.3d 893 (7th Cir.1994) (Judge Rovner explained *Sowa's* significance while rejecting the defendant's claim that the government's delay of his indictment until almost four years after his charged threatening telephone call and three years after he allegedly had confessed to an FBI agent denied his due process right because relevant telephone records had been destroyed). The balance in *Sowa* struck in favor of the government because it had strong reasons for delay and because Sowa had, to some extent, caused his own prejudice.

### Prejudice in This Case

■ In contrast to *Sowa*, Defendant did not contribute to the prejudice he suffered from the government's preindictment delay. The prejudice he suffered was caused entirely by government representatives. To establish a due process violation, a defendant in this Circuit must demonstrate that preindictment delay prejudiced him in a "concrete and substantial" manner. *United States v. Miner*, 127 F.3d 610, 615 (7th Cir.1997). It is not sufficient for the defendant to show that he is " 'only somewhat prejudiced by the lapse of time.' " *Id.* (quoting *United States v. Smith*, 80 F.3d 1188, 1192 (7th Cir.1996)). This is certainly not the case here; there is no question that Defendant has established severe, actual prejudice. We recognize that witness deaths alone may meet the required showing of prejudice. The death of a witness prejudices a defendant sufficiently for due process purposes when the court is " 'convinced that [the witness] would have testified, that his testimony would have withstood cross-examination, and that the jury would have found [him] a credible witness.' " *United States v. Doerr*, 886 F.2d 944, 964 (7th Cir.1989) (quoting *United States v. Valona*, 834 F.2d 1334, 1339 (7th Cir.1987)). We have already made these determinations with respect to all three witnesses who are unavailable. Weighing this testimony against the other trial evidence, we also conclude that any of these witnesses' testimony could well have been outcome-determinative. *See id.* (in making determination of prejudice resulting from deceased witness, court must "[e]valuate this testimony against the other trial evidence to determine if indeed its introduction would affect the trial outcome.") (internal quotations and citations omitted). We emphasize, however, that our finding of prejudice is based on the combination of the factors listed above, not premised on the death of any one witness. As detailed extensively in our findings of fact, the lost evidence, impaired memories of fact witnesses, flawed governmental reports,[6] and deceased key witnesses have combined to plague Defendant with just the kind of concrete and substantial prejudice that the Due Process Clause was designed to remedy.

---

**6.** This finding applies equally to all the government's reports available in this case, which the Court has carefully reviewed. This Court is fully aware that no one in the United States Attorneys Office is personally responsible for the ill-prepared investigative reports in this investigation. Yet, by 1992, when it received the full case report, the government was aware that these reports existed and that witnesses would inevitably need to rely on them to enhance their memory at trial. Moreover, government culpability for preindictment delay is often based on the actions of "government representatives," not just the conduct of the prosecutor. *See, e.g., United States v. Glist*, 594 F.2d 1374, 1378 (10th Cir. 1979) (affirming indictment dismissal based on "substantial fault by government representatives," including government agents who failed to develop facts responsibly).

When confronted with similar circumstances that became apparent after five days of trial, U.S. District Judge Matsch, whom this Court greatly respects, stopped a criminal trial in midstream and made the following statement:

> Considering all that has happened since we have started this matter and particularly in the trial of the criminal case, I think I have now come to understand when preindictment delay is so prejudicial that no trial can be conducted. I suppose, like the famous phrase with respect to obscenity, you have to have great difficulty in attempting to define it, but you know it when you see it.
>
> I have seen it in this trial.
>
> It's a combination of many things.

*United States v. Glist,* 594 F.2d 1374, 1377 (10th Cir.1979) (affirming Judge Matsch's indictment dismissal under *Lovasco* and *Marion* even though government did not deliberately attempt to prejudice defendant). Similarly, in this case, this Court concludes, on the basis of its experience as an observer, participant and presider of over one hundred trials, that the combination of events here reek with the type of prejudice that can only result in an unfair trial.

The government responds to this strong showing of prejudice by attempting to shift to Defendant the blame for the delay and resulting prejudice. For example, the government suggested that Emmanuel Brunious, the employee who left work early on the day of the fire because he started earlier than usual, could have testified in May 1997 before his death one month later—if only Defendant hadn't requested a continuance. But this argument ignores the fact that Mr. Brunious was already critically ill in May 1997, and accepts no responsibility for the consequences of the government's four-year delay. Even more strained is the government's assertion that Defendant should somehow have preserved his father's potential alibi testimony by obtaining his sworn written statement before he died. This "blame the defendant" approach, which,

again, refuses to acknowledge the government's own responsibilities, must be rejected.

At the December 31, 1997 hearing, this Court expressed great skepticism that the Constitution requires a potential defendant to preserve evidence during the preindictment phase, just in case he is ever indicted. In urging this proposition, the government initially relied heavily on certain language in the latest Seventh Circuit case to reject an assertion of unconstitutional preindictment delay. *See United States v. Miner,* 127 F.3d 610, 614–15 (7th Cir.1997). In *Miner,* Judge Bauer affirmed the lower court's decision finding no prejudice to a perjury defendant whose dead husband had made statements inculpating her. Judge Bauer quoted extensively from Magistrate Judge Crocker's factual findings, relying on a portion of the opinion where Magistrate Judge Crocker happened to state:

> "[The defendant's husband]'s previous statements inculpated [the defendant]. If he had other evidence to provide, [the defendant] was in a position to know this and to obtain that evidence from her husband prior to his death." [7]

*Id.* at 616. But Magistrate Judge Crocker does not provide any legal authority for the proposition that a defendant has a duty to preserve exculpatory evidence. This Court informed the government that it considered Magistrate Judge Crocker's statement simply a part of his factual findings. We explicitly requested any legal authority holding that a potential defendant has a duty to preserve exculpatory evidence before he is indicted in order to avoid any prejudice that might be caused by the government's delay. (12/31/97 Tr., pp. 62–64). Not surprisingly, the government failed to turn this Court's attention to any legal authority supporting this novel argument, which would subvert two fundamental constitutional protections— the presumption of innocence and the government's burden to prove guilt beyond a reasonable doubt. The Court's independent research has likewise failed to uncover any cases burdening a criminal defendant with the duty to preserve evidence before he is indicted.[8] In light of the government's fail-

---

7. The bracketed material was inserted by this Court.

8. The reality is that a criminal defendant almost always harbors the hope that the government will not seek an indictment. This is especially

ure to do its part to preserve critical evidence, the prejudice to Defendant is even more serious.

### The Government's Reasons for Delay

In contrast to Defendant's clear showing of prejudice, the government offers no legitimate investigatory reasons in support of its delay. In its initial response to the renewed motion, the government made the following critical admission: "[t]he investigation of this case essentially was complete by June 1992. The government received the case file [report] in December 1992." (Govt's 12/19/97 Resp. to Def's Renewed Mot. p. 9). The case report referenced in the government's response was actually admitted as Government Exhibit 5 at the December 31, 1997 hearing. The Court's careful review of Exhibit 5 confirms that this investigation was indeed completed in December of 1992.

The government's attempts to demonstrate any legitimate investigative activity after December 1992 utterly fail. After the Court expressed concerns about the legitimate investigatory reasons for the four-year-and-two-month delay between December, 1992 and the return of the indictment in February, 1997, the government filed a supplemental response that indicated that it sought and obtained certain tax records, which were described in the case report dated December, 1992 (*See* Ex. 5, p. 10), in 1993 and 1994. The government explained that certain unnamed witnesses then appeared before the grand jury in August 1996 before the indictment was obtained in February of 1997. The government also asserted in its initial response that the Assistant United States Attorney assigned to this case personally interviewed all the witnesses in this case during the over four-year delay. Finally, the Assistant United States Attorney principally assigned to this case reiterated in his supplemental response that he was overly busy on

other prosecutorial priorities and had taken little personal vacation time since 1994.

The government's explanations for its delay are simply unavailing and do not come close to justifying the extreme and compound prejudice that Defendant suffered from the government's non-investigative delays in this case. No new witnesses or documentary evidence were uncovered or even sought during this time. The tax returns mentioned by the government were detailed in the December 1992 case report and were available by court order before or after an indictment in this case. (*See* Ex. 5 12/31/97 hearing). 26 U.S.C. § 6103(i). Again, in the government's own words, "[t]he investigation of this case essentially was complete by June 1992." (Govt's 12/19/97 resp. to Def's Renewed Mot. p. 9).

In light of this Court's prior factual finding of severe, actual prejudice—heightened in this kind of circumstantial, "whodunit" case—applying the *Lovasco/Sowa* balancing test leads the Court reluctantly to conclude that Defendant's due process rights have been violated by the government's reckless delay in seeking an indictment.

The government strongly asserts that recklessness is not enough—that this Court cannot find a due process violation unless we find that the government intentionally sought to gain a tactical advantage by delaying the indictment. This high, bad faith intent standard is simply not required by the *Lovasco/Sowa* balancing test. In fact, as noted herein, *Lovasco* expressly acknowledged the government's concession that a showing of recklessness would violate the Due Process Clause. Moreover, as early as 1984, the Seventh Circuit acknowledged that an unintentional delay could violate the Constitution. *United States v. Williams*, 738 F.2d 172 (7th Cir.1984) (no substantial prejudice found by

---

true in the case of circumstantial, financial crimes. Defendant himself presumably waited after the August 1, 1991 fire, hoping that an indictment would never be returned. Nor did he have reason to think it would. Defendant received no notice following the fire indicating that he was a government target—unlike the defendant in *Miner,* who had received a target letter from the U.S. Attorneys' office telling her that

she was suspected to have perjured herself. This Court provided the government with ample opportunity to point to concrete evidence that Defendant knew the government was still investigating him in 1993 or 1994. None has been forthcoming. Under these circumstances, Defendant cannot be blamed for failing to preserve his father's exculpatory testimony, even assuming he had some duty to do so.

defendant by four-year delay in return of indictment). There, the Court stated:

> We are loath to impose a judicial review on prosecutorial decisions such as the priority of cases for prosecution, yet we note that our balancing is a place of last resort for defendants whose cases have fallen between the prosecutorial cracks. An unintentional delay may work to the disadvantage of the government as well as the defendant, but the government can choose not to prosecute the case. The due process clause should provide the defendant with a similar escape, but only where the balance of prejudice to the defendant against the reasons for delay, although unintentional, is so detrimental to the defendant's case as to be patently unfair. The actual prejudice to the defendant, however, must be so substantial as to outweigh the preferable deference to legitimate prosecutorial priorities and bureaucratic realities.

738 F.2d at 175 n. 2.

■ This Court's reading of the *Lovasco, Sowa* and *Williams* decisions compels the conclusion that a showing of substantial, actual, and compound prejudice, such as Defendant established here, when coupled with the government's recklessness and lack of legitimate investigatory justification for the delay, violates the Constitution. This interpretation of *Lovasco* finds support in the Fourth and Ninth Circuits, and the Court's analysis of the Seventh Circuit's decision in *Sowa* demonstrates its harmony with the Fourth and Ninth Circuits' positions.

The Fourth and Ninth Circuits have explicitly eschewed the bad faith requirement in favor of a lesser showing of government culpability in cases where the defendant has been greatly prejudiced by the delay. *See United States v. Ross*, 123 F.2d 1181, 1184–85 (9th Cir.1997) ("Whether due process has been violated is decided under a balancing test and '[i]f mere negligent conduct by the prosecutors is asserted, then obviously the

delay and/or prejudice suffered by the defendant will have to be greater.'") (quoting *United States v. Moran*, 759 F.2d 777, 782 (9th Cir.1985)); *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir.1990) (affirming district court's grant of writ of habeas corpus on the basis of preindictment delay because the government conceded prejudice and admitted it was "negligent" in delaying prosecution). Using *Lovasco's* balancing test, these circuits hold governmental negligence sufficient to establish a due process violation when the delay prejudices the defendant to the point that it "violates fundamental conceptions of justice." *Moran*, 759 F.2d at 782 (citing *Lovasco*, 431 U.S. at 790); *Howell*, 904 F.2d at 895.[9] They consider a rigid bad-faith requirement to be incompatible with *Lovasco's* flexible balancing test. *Howell*, 904 F.2d at 895; *Moran*, 759 F.2d at 781–82.

But these decisions are only one side of a wide circuit split. Several other circuits demand a showing that the government acted in bad faith or intentionally delayed the indictment to gain tactical advantage. *See United States v. Crouch*, 84 F.3d 1497, 1511–12 (5th Cir.1996) (en banc) (noting that the First, Second, Third, Sixth, Tenth, Eleventh, and D.C. Circuits apply this standard; citing cases). Significantly, these circuits dispense with balancing prejudice and governmental fault. They instead adopt the bright-line rule that preindictment delay can never violate due process without a showing of bad faith. Although in the clear majority, these decisions are flatly inconsistent with the *Lavasco/Sowa* balancing test. A close reading of *Sowa* shows that it sits on the Fourth and Ninth Circuit's side of the split, where bad faith is not a prerequisite to a due process violation.

*Sowa* resolved a longstanding conflict in this Circuit over whether the government must explain the preindictment delay or whether the defendant must show that the delay was unjustified. The court placed the

---

9. Earlier caselaw in the Tenth Circuit likewise refused to require prosecutorial intent to deceive, and instead found a due process violation in the face of "substantial fault by government representatives." *United States v. Glist*, 594 F.2d 1374, 1378 (10th Cir.1979) (affirming dismissal of indictment where government agents failed to develop the facts adequately, resulting in a "shambles of a trial") (quoting district court). Although *Glist* has never been overruled, it appears that the Tenth Circuit has recently begun to require purposeful governmental delay. *See United States v. Engstrom*, 965 F.2d 836, 839 (10th Cir.1992).

burden on the prosecution, holding that "the government must come forward and provide its reasons for delay. These reasons are then balanced against the defendant's prejudice to determine whether the defendant has been denied due process." 34 F.3d at 451. The core holding of *Sowa* is that preindictment due process is determined by a balancing test—not a rigid standard of fault. It is clear from this language that *Sowa* never dictated a standard of intentional governmental fault that must be satisfied in all cases; like the Fourth and Ninth Circuits, it implemented a flexible balancing test.

In accordance with this standard, we find that the government's preindictment conduct here reaches a level of recklessness that, balanced against the prejudice to Defendant, violates "fundamental conceptions of justice." *Howell,* 904 F.2d at 895. We further conclude that, given the extreme prejudice caused by the government's long delay in this case, even negligence on the government's part would violate Defendant's due process rights. The government's explanations for its delay are "impermissible reasons" under the circumstances presented here. *Sowa,* 34 F.3d at 450 (citing *United States v. Marion,* 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)).

Simply put, if this case doesn't present a case of unconstitutional prejudicial preindictment delay, no case will. The circuits that require a showing of intentional bad faith delay to gain a tactical advantage over the defendant seem to set an impossible threshold for criminal defendants. No defendant can get into the mind of a prosecutor to determine why a case was delayed, and certainly no prosecutor will ever admit to such bad faith purposes. *Lovasco,* at the very least, must be read to allow defendants to prove bad faith circumstantially, by the absence of a legitimate investigatory reason.

The *Lovasco* Court touched on only two types of delay—investigative delay and bad faith delay "to gain tactical advantage over the accused." 431 U.S. at 795. The two are fundamentally different and, in this Court's view, mutually exclusive. Consequently, if the prosecution cannot come up with any investigative justification for preindictment delay, *Lovasco* provides authority for presuming bad faith. Such a circumstantial

method of proving bad intent is common to our criminal justice system—prosecutors frequently rely on it to obtain convictions for intent-based crimes. This interpretation of *Lovasco* also recognizes the fact that, in our adversarial system of justice, it is highly unlikely that any delay is truly neutral or benign. *Marion,* 404 U.S. at 321–22 (possible prejudice is inherent in any delay, however short). For these reasons, the Seventh Circuit correctly determined in *Sowa* that a balancing of prejudice and the reasons for delay, not a direct showing of bad faith, is the standard for finding a due process violation.

We reiterate, consistent with our January 5, 1998 oral ruling, that we do not believe that the Assistant United States Attorney sat back in his office and carefully waited to indict this case until events transpired to turn the case in the government's favor. (*See* 1/5/98 Tr. pp. 20–21). Still, the absence of any legitimate investigatory reason for the long preindictment delay is strong circumstantial evidence of bad faith under *Lovasco's* either-or scheme of investigative vs. non-investigative delay.

We reject the government's attempt to heavily rely on the fact that the Seventh Circuit has never found a preindictment delay that violated the Constitution. Each case is different and there is no indication that our Circuit has ever reviewed the *granting* of a motion to dismiss for prejudicial preindictment delay. Yet various district courts, including one in our district, have dismissed indictments for unconstitutional preindictment delay. *See, e.g., United States v. Corral–Chaidez,* 1987 WL 9577 (N.D.Ill.1987) (Marshall, J.); *United States v. Sample,* 565 F.Supp. 1166 (E.D.Va.1983); *United States v. Alderman,* 423 F.Supp. 847 (D.Md.1976).

### The Government's Recklessness In This Case

"Reckless" conduct means acting in a way that is "indifferent to consequences." *Black's Law Dictionary* 1270 (6th ed.1990). The Third Circuit has defined reckless prosecution in the double jeopardy context by reference to the Model Penal Code's definition of recklessness: a "conscious disregard"

of a "substantial and unjustifiable risk." *Government v. Scuito*, 623 F.2d 869, 872 n. 7 (3d Cir.1980). The government's preindictment conduct here more than satisfies these definitions.

Over the last few years, the Seventh Circuit and various other courts have warned the United States Attorney's Office that administrative, bureaucratical, non-investigatory problems cannot provide a compelling justification for long delays in returning indictments. *See, e.g., United States v. Bell*, 1993 WL 95368, at *2 (N.D.Ill.1993). In 1991, Judge Bauer wrote a concurring opinion that expressed his "strongly held belief that criminal justice, if it is to be effective at all as a detriment, must be administered in hot blood; that is, as close to the criminal act as possible." *United States v. Ashford*, 924 F.2d 1416, 1426 (7th Cir.1991) (Bauer, J., concurring) (expressing concern over four years delay in routine indictment; however, no prejudice shown by defendant). In 1992, Judge Flaum referred to Judge Bauer's concurring opinion in warning the United States Attorney's Office that excessive workloads and staff turnover could hardly provide a compelling justification for a long preindictment delay. *United States v. Anagnostou*, 974 F.2d 939, 943 (7th Cir.1992) (holding that missing deceased witness did not prejudice the defendant but expressly warning that holding should not be read to condone a five-year indictment delay). Thus, by 1992, the United States Attorney's Office was aware that waiting to indict a case on the eve of the running of the applicable statute of limitations may be pushing the "due process" envelope to the edge.

Despite this knowledge, the government remained indifferent to the severe consequences of delaying Defendant's indictment. The government had, by its own admission, fully completed its criminal investigation of Defendant by December 1992. It was aware that its case was a circumstantial arson case and that Defendant's main alibi witness, his father, was 78 years old. The government was also well aware that circumstantial arson cases are not easier to defend as they get older. The government's case relies mainly on financial motive evidence—evidence that never fades and remains documented in financial and insurance records. In contrast, Defendant's ability to mount a defense suffers from the fatal combination of diminished memories, flawed government reports, lost evidence and unavailable witnesses.

While the government also prejudiced itself somewhat by delaying its prosecution of this case, the prejudice is overwhelmingly felt by Defendant in this type of circumstantial arson-for-profit case. This fact was confirmed at the New Year's Eve evidentiary hearing in which Special Agent Mirocha confirmed that he wrote down only important *incriminating* information when he arrived on the scene. He had *no* independent recollection of any potential exculpatory statements made to him by the only three persons at the site of the fire in 1991, which included Defendant and his now-deceased father. How can ordinary, untrained lay-persons be expected to remember the important events over six years later when a trained criminal investigator cannot remember key conversations on which the government is attempting to base a conviction? In this case, the Court personally saw and tested the actual prejudice that faded memories visited on the Defendant.

In spite of its knowledge about the circumstances surrounding the investigation, ill-prepared reports, elderly and sick key witnesses, a case agent who passed away, faded memories of the government's own investigative agents, and missing physical evidence, the government consciously delayed seeking an indictment in 1993, 1994, 1995 and 1996. This prosecutorial behavior was at the very least reckless, and, under the circumstances presented by this case, violated the Due Process Clause.

### Conclusion

This has been a very difficult opinion for this Court to issue. The Court's difficulty was not because of the factual and legal issues presented by this opinion. Instead, after much contemplation, the Court realizes that its difficulty lies in the fact that it is a true believer in our country's adversarial system of justice. In this case, the Court has had to step out of its traditional role of presiding over an adversarial trial that would have determined whether Defendant was guilty or not guilty, and instead issued an order that pulls this case away from the adversarial process.

Yet, as one legal commentator has profoundly noted: "[t]ime is not a neutral feature with respect to the quality of adversarial trials." Phyllis Goldfarb, *When Judges Abandon Analogy: The Problem of Delay in Commencing Criminal Prosecutions*, 31 Wm. & Mary L.Rev. 607, 607 (1990). The requirement of prompt and fair justice has been part of the common law tradition since the Magna Carta. This right was recognized in the early state constitutions even before it was embodied in the Sixth Amendment to the United States Constitution. *See United States v. Lovasco*, 431 U.S. 783, 799, 97 S.Ct. 2044, 52 L.Ed.2d 752 (Stevens, J., dissenting). The reason this fundamental constitutional right was recognized so early on in our nation's history is the well-established fact that a trial conducted years after the alleged commission of an offense inevitably suffers from impaired fact finding.

It is truly unfortunate that the unexplained delay by the United States Attorney's Office caused foreseeable prejudice under the unique circumstances presented in this case. This blame must be squarely shouldered by the entire United States Attorney's Office and not just the randomly assigned Assistant United States Attorney working on this case. This case does not diminish the high regard that this Court feels for the United States Attorney's Office of this district and its difficult and complex task in managing its resources and establishing its prosecutorial priorities.[10] Yet, the Office would do well to heed the prior admonition of Judge Bauer to prosecute cases in "hot blood". The office should continue to adhere to its high standards of winning or losing its cases on fair, if not equal, footing with the defendants it chooses to prosecute.

In this case, an unfortunate, yet foreseeable, combination of circumstances came together to cause great prejudice to Defendant. The United States Attorney's Office probably will very seldom confront the type of unique circumstances presented in this case, yet it would do well to implement and adhere to a standard preindictment monitoring system to ensure that the timing of its charging decisions does not unnecessarily raise serious constitutional issues. This monitoring system may be especially needed in circumstantial arson cases given Congress' express desire to lengthen the applicable statute of limitations.

Ultimately, this Court needed to decide whether compelling Defendant to stand trial after the government delayed the indictment in a recklessly prejudicial fashion, with no legitimate investigative purpose, violates those fundamental conceptions of justice that define our community's sense of fair play and decency. The Court's answer to this question is an unequivocal "yes". Thus, the indictment must be dismissed with prejudice.

---

**10.** These resource problems, however, do not justify non-investigative delays. Even the most difficult and complex arson cases can be indicted within a short period of time by properly allocating investigative and prosecutorial resources. *See, e.g., United States v. McVeigh*, 954 F.Supp. 1441 (D.Col.1997) (two defendants indicted in death penalty arson cases on August 10, 1995, following bombing of Murrah Federal Building on April 19, 1995). Congress has shown no reluctance to expand prosecutorial and investigative resources upon a proper showing of need, as shown by the drastic expansion of all the United States' Attorneys offices throughout the country over the last ten years.