IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 19, 2003

## STATE OF TENNESSEE v. RUSSELL DALE OLIVER

**Appeal from the Circuit Court for Johnson County**
**No. 3346     Robert E. Cupp, Judge**

**No. E2003-00123-CCA-R3-CD**
**November 3, 2003**

The defendant, Russell Dale Oliver, was convicted by a jury in the Johnson County Circuit Court of murder in the first degree and sentenced to life in prison. In this appeal as of right, the defendant contends that the trial court erred by overruling his motion to dismiss the indictment based on the violation of his right to a speedy prosecution and trial and that the evidence is insufficient to convict him of murder in the first degree. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

James T. Bowman, Johnson City, Tennessee, for the appellant, Russell Dale Oliver.

Paul G. Summers, Attorney General and Reporter; David H. Finley, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Kenneth Carson Baldwin and Anthony Wade Clark, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case relates to the defendant's killing Kenneth Herman Gaitor while confined at the Northeast Correction Center on April 19, 1995. Agent Shannon Morton of the Tennessee Bureau of Investigation testified that the defendant and Jay Denton lived in the building housing unit twelve at the Northeast Correction Center and that the victim was stabbed at the entrance to the building housing units thirteen and fourteen at the prison. He said inmates were usually reluctant to talk about prison murders until they are released or close to release from prison. On cross-examination, however, he acknowledged that inmates often lied to investigators for vengeance against other inmates or for favorable treatment from the state.

Scott Noland testified that he was in prison for aggravated robbery and burglary convictions and that he saw an altercation between the defendant and the victim in the prison cafeteria on April

19, 1995. He said that the victim cut in front of and bumped into the defendant, who was already in the dinner line. He said that the defendant asked the victim if he was going to say "excuse me" and that the victim replied by saying "Fuck you" or something similar. On cross-examination, Noland said that he did not report the cafeteria incident on April 20, 1995, when interviewed by investigators, but said that investigators only asked him about the stabbing, not the cafeteria incident. He said that he was not receiving any favorable treatment for his testimony.

Coralee Campbell testified that she was a cafeteria worker at the prison and that on April 19, 1995, African-American inmates rushed into the dinner line for second servings before all the white inmates had been served. She said that she heard a voice apologize for getting in the way and that she heard a white inmate respond that it was all right because they would settle the matter later. On cross-examination, she acknowledged that she never saw any faces during the incident.

Craig Julian testified that he worked at the prison as a yard sergeant and that he found the victim lying face down with a stab wound in his side after dinner. John Buckland testified that he was an inner yard officer at the prison on the day the victim was killed. He said he heard a scream and saw two inmates leaving the building housing units thirteen and fourteen. He said he saw a third inmate fall down, clutch his stomach, and point at the two inmates leaving units thirteen and fourteen. He stated the fallen inmate said "he just stuck me" as he pointed at the pair. He said he approached the inmate who had fallen and saw that it was Gaitor. He said that the two other inmates were hurrying away from the victim and that one of the inmates was the defendant. He said that he followed the defendant and the other inmate toward the building housing units eleven and twelve and that he told them to stop but that they only quickened their pace. On cross-examination, he acknowledged that he lost sight of the defendant while following him into the building housing units eleven and twelve and that the only distinguishing clothing on the defendant was a cap that he was wearing. He also said that he could not identify the defendant by name on the day of the murder.

Billy Icenhour testified that he was the unit officer for unit twelve on April 19, 1995, and that he witnessed the defendant enter unit twelve and stick an approximately eight-inch "shank" in his shirt. He said that he told the defendant to come to him twice but that the defendant did not respond to his directions. He said the defendant looked pale and crazy and continued walking despite his orders. He said that approximately one minute later, Officer Buckland entered unit twelve looking for the defendant. He said that he let Officer Buckland inside unit twelve and that he lost sight of the defendant during this time. He said the defendant walked approximately thirty feet while he was unlocking the door to allow Officer Buckland to enter unit twelve. He said that he followed Officer Buckland and that when they reached the defendant, he was no longer in possession of the "shank." On cross-examination, he said that he did not attempt to stop the defendant without Officer Buckland present because the defendant was carrying a weapon.

Dr. William McCormick testified that he was the Deputy Chief Medical Examiner for Johnson County and that the victim died of a wound from a knifelike object. He said that based upon the wound, it would not be unusual if no blood was found on the attacker. He said the weapon itself would only have trace amounts of blood on it because it would clean itself when the attacker

removed the weapon from the victim. On cross-examination, he said the wound in the victim could have been caused by weapons of various sizes.

James Parsons testified that he was a Correctional Corporal at the prison and that he was gathering clothes from inmates on April 19, 1995, after the victim had been stabbed. He said the defendant initially refused to give him his clothes. He said that once the defendant finally gave him his clothes, the defendant gave him the name of another inmate in the prison instead of his correct name.

Michael Vaulton testified that he was in prison for burglary and theft and that he was friends with the defendant and Mr. Denton while in prison. He said the defendant had a negative opinion of African-Americans. He said he did not go to dinner with the defendant and Denton on April 19, 1995, because he was busy making a "dremel," a homemade weapon. He said that when the defendant and Denton returned from the cafeteria, they told him to put the contraband away, indicating a "lockdown" was to occur. He said the defendant told him he was going to kill an inmate who had "disrespected" him. He said that he offered to help the defendant beat up the individual who had "disrespected" him but that the defendant was determined to kill the inmate.

Vaulton testified that he, the defendant, and Denton went to a picnic table to wait for the victim to leave the cafeteria. He said that the defendant saw the victim and that Denton accompanied the defendant in case anything went wrong when the defendant attacked the victim. Vaulton said he left the defendant and Denton to find a can of Skoal. He said that he heard a scream and that he saw a man on the ground when he left the unit fourteen hallway. Vaulton said he saw Denton at the time of the scream and that Denton was standing still at the time. He said he saw the defendant and Denton rush to unit twelve with Officer Buckland in pursuit.

Vaulton testified that later, when he, the defendant, and Denton were placed in administrative segregation, the defendant told him that he stabbed the victim and then returned the knife to its hiding place in a cooler. He said he did not tell the Tennessee Bureau of Investigation this information in 1995 because he did not like the agent on the case at that time. He said he was testifying now because the defendant was trying to implicate Denton in the crime. On cross-examination, Vaulton denied being a lookout for the defendant on April 19, 1995, and again asserted that he left the defendant and Denton to look for a can of Skoal. He acknowledged he was friends with both Denton and Denton's son and admitted that he denied any knowledge of the killing initially. On redirect examination, he said the district attorney's office never threatened to charge him in the victim's murder.

Jay Denton testified that he was in prison for aggravated robbery, escape, and third degree burglary and that he was receiving a five-year sentence for the killing of the victim in exchange for his testimony against the defendant. He said that on April 19, 1995, the victim "bulldozed" through him and the defendant while they were in line at the cafeteria. He said the victim told the defendant he had already killed one "white mother fucker" and the victim said he would to do it again. He said the victim stated that they would settle the matter later. He said the defendant was visibly upset and

did not eat anything at dinner. He stated that after they left the cafeteria, the defendant said he was going to kill the victim. He said the defendant would not listen to him or Vaulton when they tried to convince the defendant not to kill the victim. He said that they left to watch for the victim and that he and the defendant each took eight-inch knives with them. He said that the defendant recognized the victim leaving the cafeteria and that they went to the building housing units thirteen and fourteen to wait on the victim. He said the victim entered the area around unit thirteen and looked at him. He said the defendant then stabbed the victim in the back with the knife without any hesitation. Denton said he was only there to help the defendant if anyone else joined the fight.

Denton testified that when they left the building housing units thirteen and fourteen, he never heard guards telling him to stop. He said that he gave his knife to the defendant and that eventually Billy Smith took possession of the weapons. He said that Smith gave the weapons back to the defendant later and that the defendant returned them to the cooler where he always hid them. On cross-examination, Denton said that Vaulton was acting as a lookout on the evening of the killing. He said Vaulton pushed the victim out of the doorway after the defendant stabbed the victim. He admitted that he was the third highest ranking member in a prison organization that was only for whites. He acknowledged that he had read the statements of other witnesses before testifying.

## I. DUE PROCESS/SPEEDY TRIAL

The defendant contends that the trial court erred by not dismissing the indictment because (1) too much time elapsed between the commission of the crime and the initiation of proceedings against him and, (2) once he was indicted, too much time elapsed before he was tried. The defendant does not address separately the issues of speedy trial under the Sixth Amendment to the United States Constitution and article I, § 9 of the Tennessee Constitution and due process under the Fifth and Fourteenth Amendments to the United States Constitution and article I, § 8 of the Tennessee Constitution. We note that the delay between the commission of an offense and the initiation of formal proceedings does not violate a defendant's right to a speedy trial, but it may violate the defendant's right to due process. State v. Gray, 917 S.W.2d 668, 671 (Tenn. 1996).

### A. Due Process

The defendant contends that his prosecution for the offense approximately seven years after it occurred was an unreasonable delay that should have resulted in the dismissal of the indictment. The offense was committed in 1995, the state had knowledge of the offense, and the defendant was not indicted after the dismissal of the first indictment until March 26, 1999. In State v. Dykes, 803 S.W.2d 250, 256 (Tenn. Crim. App. 1990), relying upon United States v. Marion, 404 U.S. 307, 92 S. Ct. 455 (1971), this court stated that "[b]efore an accused is entitled to relief based upon the delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused." In State v. Utley, 956 S.W.2d 489, 495 (Tenn. 1997), the supreme court acknowledged the "Marion-Dykes" analysis for cases of delay in charging a defendant. We note, though, that in

-4-

United States v. Lavasco, 431 U.S. 783, 97 S. Ct. 2044 (1977), involving preindictment delay, both the majority and dissenting opinions looked to the prosecution to justify the delay. This casts doubt as to whether the U.S. Supreme Court continues to require the defendant to prove the state's intent regarding its actions and inactions before charges are brought. See, e.g., United States v. Sowa, 34 F.3d 447, 451 (7th Cir. 1994) (holding that once the defendant has proved actual and substantial prejudice, government must provide its reasons for delay, to be balanced against prejudice to determine whether due process has been denied), cert. denied, 513 U.S. 1117, 115 S. Ct. 915 (1995); Howell v. Barker, 904 F.2d 889, 895 (4th Cir.), cert. denied, 498 U.S. 1016, 111 S. Ct. 590 (1990); but see, e.g., United States v. Crouch, 84 F.3d 1497, 1510-14 (5th Cir. 1996) (rejecting the balancing approach and holding that defendant must show that the prosecution acted intentionally to gain a tactical advantage), cert. denied, 519 U.S. 1076, 117 S. Ct. 736 (1997); United States v. Gouveia, 467 U.S. 180, 192, 104 S. Ct. 2292, 2300 (1984) (holding that the defendant must prove that the Government's delay in bringing the indictment was deliberate to gain an advantage over the defendant).

In any event, regardless of whether the defendant has the burden of showing an intentional, tactical delay by the state, he has not shown any prejudice caused by the delay. The killing itself and the circumstances surrounding the killing were described in definite and accurate terms. The defendant does not contend that he was denied the benefit of witnesses who have become unavailable or that evidence was lost during the delay. The only prejudice claimed is that because the state did not bring him to trial without delay, he was forced to remain in administrative security, commonly referred to as the maximum security unit, for the entire seven years between the commission of the offense and the trial. The defendant's segregation, however, was the result of the Department of Correction's independent investigation. The warden of the Northeast Correction Center, Howard Carlton, testified that a defendant's placement in maximum security is not altered based upon a defendant's being found guilty or not guilty. The warden further testified that each inmate's file in maximum security is reviewed every thirty days to determine if the inmate remains a threat to the general prison population and should remain in the maximum security units. There was no prejudice resulting from the seven-year delay between the commission of the offense and the trial. Consequently, there was no denial of due process.

## B. Speedy Trial

Once the state initiates criminal proceedings, the right to a speedy trial is implicated under the Sixth Amendment to the United States Constitution and art. I, § 9 of the Tennessee Constitution. In Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972), the Supreme Court devised a balancing test to determine whether a defendant received a speedy trial and identified the following factors for consideration:

> (1) The length of delay.
> (2) The reason for the delay.
> (3) The defendant's assertion of his right to speedy trial.
> (4) The prejudice to the defendant.

Id. at 2192. In State v. Bishop, 493 S.W.2d 81 (Tenn. 1973), our court implicitly adopted the Barker balancing test for our state's constitutional and statutory right to a speedy trial.

The defendant was initially indicted on May 19, 1995. This indictment was dismissed on April 19, 1996, by nolle prosequi. He was indicted again on March 26, 1999, because two inmates came forward with new information. The defendant's first attorney filed for continuances on July 6, 2000, and February 9, 2001. On May 21, 2001, the trial court delayed the trial date and replaced the attorney with another attorney because the first attorney was still unprepared for trial. The trial was then set for August 27, 2001, reset for December 2001, and reset again for March 5, 2002. The defendant agreed to these two delays to allow the state to test a potential murder weapon that was newly discovered.

The March 5 trial date was then delayed due to the illness of defense counsel's brother and reset for July 8, 2002. This trial date was delayed because the original trial judge was forced to recuse himself due to improper information he received from the defendant's co-counsel. On August 19, 2002, the defendant filed a motion to dismiss the charge for lack of a speedy trial. The trial began on August 20, 2002, and the defendant was convicted of first degree murder. The defendant's motion for dismissal was overruled on December 13, 2002. There was a three-year, five-month delay between the second indictment and the trial, which is sufficient to trigger consideration under the balancing test.

The reason for the delay carries significance in relation to the level of the prosecution's diligence, official negligence, or bad faith involvement in the delay. Official bad faith in causing delay will be weighed heavily against the prosecution. Barker, 407 U.S. at 532, 92 S. Ct. at 2192. The significance of prosecutorial negligence may depend upon the length of the delay. Id.

In addressing the reason for the delay, the state asserts that the delay is not attributable to the prosecution. The state's only two requests for continuances were to test new evidence, and the defendant agreed to these delays. The state asserts that no other delay was attributable to it. The defendant does not argue that the state was at fault for the delays and instead focuses on former defense counsel's negligence to address the delays. The defendant asserts that the lack of preparation by his first attorney, resulting in a fifteen-month delay of the defendant's case, should weigh in favor of dismissing the case.

Delay that is caused or acquiesced in by the defendant is weighed against the defendant. State v. Wood, 924 S.W.2d 342, 347 (Tenn. 1996). Evidence shows that the defendant never demanded a speedy trial while his first attorney represented him and that he did not object to his attorney's two requests for continuances. Moreover, at the defendant's pretrial hearing on the motion to dismiss for a speedy trial violation, the defendant told the court that he believed the attorney had done his job. Because the defendant acquiesced in his attorney's delays in the case, the reason for delay weighs against the defendant.

Relevant to prejudice, <u>Barker</u>, 407 U.S. at 532, 92 S. Ct. at 2193, lists three interests of the defendant to consider: (a) the prevention of oppressive pretrial incarceration, (b) the minimization of the defendant's anxiety and concern, and (c) the limitation of the possibility of the defense being impaired--the last being considered the most serious interest because of its potential to skew the fairness of the entire system. The defendant implies that his defense has not been impaired due to the delay. He only suggests that memories tend to fade with time.

The defendant's paramount claim with regard to prejudice is again that he was held in administrative segregation during the entire seven years between the killing and the trial. Initially, we note that while the defendant was held in maximum security from 1996 through 1999, he was not under indictment. Most significantly, however, is that the defendant's segregation was the result of the Department of Correction's independent investigation as described above. The defendant has failed to show any prejudice resulting from the delay.

<u>State v. Vickers</u>, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997), states that a delay of three years and nine months is not necessarily a speedy trial violation. Moreover, a total delay of over two years is not sufficient alone to presume prejudice. <u>Bishop</u>, 493 S.W.2d at 85. In addition, the defendant never raised the speedy trial issue until the day before his trial. Although this does not waive the issue, <u>id.</u> at 84-85, it is a factor. In totality, the lack of prejudice against the defendant, the lack of prosecutorial negligence or bad faith, and the defendant's failure to demand a speedy trial justify the trial court's refusing to dismiss the charges.

## II. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to show premeditation on his part. The defendant asserts that he was extremely distressed at the time of the killing and this state of mind negated his ability to act with premeditation. The state claims that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree premeditated murder is defined as an unlawful, "premeditated and intentional killing of another." T.C.A. §§ 39-13-201, -202(a)(1). Premeditation is defined as

> an act done after the exercise of reflection and judgment.
> "Premeditation" means that the intent to kill must have been formed

prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

Applying the above factors, the record in this case reveals sufficient evidence of premeditation to support the defendant's conviction for first degree murder. Viewing the evidence in the light most favorable to the state, the proof shows that most, if not all, of the factors listed in Bland are present. When the victim bumped into the defendant in the cafeteria line, the defendant told the victim that they would settle the matter later. The defendant retrieved an eight-inch knife from its hiding spot after refusing Denton's and Vaulton's pleas to not kill the victim. He waited patiently for the victim to return from the cafeteria. He then stuck a knife into the victim, who was unarmed, after stating to Vaulton and Denton that he was going to kill the victim. After the stabbing, the defendant attempted to conceal his crime by leaving the scene, hiding the knife, and giving prison officials another inmate's name. Because a rational jury could have found premeditation beyond a reasonable doubt based on these reasonable inferences, the evidence is sufficient to support the defendant's conviction for first degree murder.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

JOSEPH M. TIPTON, JUDGE

-8-