UNITED STATES of America,
Plaintiff–Appellee,

v.

Stanley SOWA, Jr., also known as Alfred Junior, II, Defendant–Appellant.

No. 93–3833.

United States Court of Appeals,
Seventh Circuit.

Argued May 12, 1994.

Decided Aug. 30, 1994.

Barry R. Elden, Asst. U.S. Atty., Ronald Safer (argued), Office of the United States Attorney, Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Kenneth L. Cunniff (argued), Chicago, IL, for defendant-appellant.

Before BAUER, COFFEY, and MANION, Circuit Judges.

BAUER, Circuit Judge.

On September 8, 1988, Stanley Sowa and Jeffrey Scalfaro brutally bludgeoned Alexis Dodds and Larayon Thomas with baseball bats. The two were tried for attempted murder and aggravated assault in Illinois state court. Scalfaro was convicted on the aggravated assault charge, but Sowa was acquitted of both charges. On November 4, 1992, a federal grand jury returned an indictment against Sowa charging him with conspiring with Scalfaro to interfere by force with the rights of Dodds and Thomas to use the streets and sidewalks of Cicero because they were black, in violation of 18 U.S.C. § 371, and with interfering with Dodds' civil rights by violence because of his race, in violation of 18 U.S.C. § 245(b)(2)(B). A jury convicted Sowa on both counts. Sowa appeals various aspects of the government's prosecution, and we affirm.

## I.  Facts

On September 8, 1988, Dodds and Thomas were returning to their Chicago homes from a stop at the Oakbrook Mall. Their trip took them through Cicero. At the intersection of 60th Court and 16th Street in Cicero, the two men passed a group of adolescents and young adults who were standing on the corner drinking beer; Sowa and Scalfaro were in this group. Members of the group angrily accosted Dodds and Thomas with racial epithets and threatened them.

After this confrontation, Scalfaro joined Sowa in his car and drove after Dodds and Thomas. Unfortunately, Sowa's house lay on the route taken by Dodds and Thomas. As Sowa and Scalfaro drove past the two black men, Sowa said to Scalfaro: "Let's fuck these guys up." Then, Sowa and Scalfaro drove to Sowa's house, where each armed himself with a baseball bat. They then waited in a gangway between Sowa's house and another building.

As Dodds and Thomas passed the gangway, Sowa and Scalfaro assaulted them. Scalfaro hit Dodds first, but when Dodds fell to the ground, Scalfaro walked away. Sowa, however, was not finished; he continued to beat Dodds with the bat. Finally, Sowa stopped the beating, telling Scalfaro: "I

think we killed the nigger." They left Dodds motionless in a pool of blood, returning to Sowa's house to order a pizza.

Two children witnessed the crime. In addition, Sowa admitted his crime to several of his friends, including his girlfriend and the grandmother of one of the child witnesses. He claimed to one friend that "hitting that nigger over the head was like splitting open a watermelon."

During the state prosecution for attempted murder and aggravated assault, the prosecution presented only three witnesses: Dodds, Thomas, and Craig Pesek, who was thirteen. All three identified Scalfaro as one of the assailants, but only Pesek could identify Sowa. Dodds and Thomas testified that they could not identify their second attacker because he had attacked them from behind. Sowa was acquitted of both charges, and Scalfaro was convicted of aggravated assault.

Once the verdict was delivered in the state court on February 15, 1990, the federal authorities began to investigate this crime. Because of the limited information available to investigators, the government agreed to immunize Scalfaro. Scalfaro testified before the federal grand jury. After encountering some red herrings and unproductive leads, the federal investigators finally located a worthwhile witness. The investigators interviewed this witness on December 17, 1991. The government was then able to piece together the events of September 8, 1988, despite reluctant (even hostile) witnesses, and the grand jury returned an indictment on November 4, 1992.

## II.  Analysis

Sowa's first issue on appeal is that the district court abused its discretion when it denied his motion to dismiss due to pre-indictment delay. Sowa argues that the government's delay in indicting him violated his Fifth Amendment right to due process. It seems that Sowa can no longer remember the events of September 8, 1988, because he has extensively and excessively abused drugs and alcohol since then. As a result of his memory loss, Sowa claims that he cannot help his attorney present a defense to the

federal charges. Since he claims to have aided in the presentation of his defense to the state charges, he blames the government's delay in bringing the indictment against him for his inability to present a defense in the district court.

We have noted on many occasions that statutes of limitations are the primary safeguard of a right to a timely indictment. *See, e.g., United States v. Ashford*, 924 F.2d 1416, 1419 (7th Cir.1991) (citation omitted). The Due Process clause, however, plays "a limited role in protecting against oppressive delay." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). The role of the Due Process clause is limited, indeed; we have never characterized a pre-indictment delay as a constitutional violation.

To establish that a pre-indictment delay violated due process, Sowa must prove that the delay caused actual and substantial prejudice to his fair trial rights, and there must be a showing that the government delayed indictment to gain a tactical advantage or some other impermissible reason. *United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). With respect to the first prong, we require that allegations of actual and substantial prejudice be "specific, concrete, and supported by evidence." *Pharm v. Hatcher*, 984 F.2d 783, 787 (7th Cir.1993). Sowa put forth evidence that he remembered the events in question at the time of his state prosecution, that he extensively abused alcohol and drugs for much of his life, and that he can no longer remember what happened on September 8, 1988. The district court believed Sowa and his witnesses and found that Sowa had proved actual and substantial prejudice resulting from the delay. This case is highly unusual; we have never encountered a case of actual and substantial prejudice resulting from a pre-indictment delay. While we are unsure that, upon *de novo* review, we would find such prejudice in the case of a defendant who deliberately destroys his own memory to his detriment, we cannot say that the district court abused its discretion in reaching its conclusion in this case.

Sowa's claim, however, fails to meet the requirements of the second prong. With respect to the government's delay, due process is only implicated if the government purposely delayed the indictment to take advantage, tactically, of the prejudice or otherwise acted in bad faith. *See United States v. Anagnostou*, 974 F.2d 939, 943 (7th Cir.1992). That is not the case here.

As an initial matter, we must address what the district court noted as confusion regarding the question of whether the burden shifts to the government to explain its reasons for delay after the defendant has proven prejudice. This confusion exists because some of our recent cases have stated that we have two divergent lines of authority addressing this issue. *See, e.g., Pharm*, 984 F.2d at 786. For example, in *United States v. Koller*, 956 F.2d 1408, 1415 (7th Cir.1992), we described one line of cases as requiring the government to prove that the pre-indictment delay was necessary once the defendant demonstrated prejudice; we called it the *King* line, after *United States v. King*, 593 F.2d 269 (7th Cir.1979), and its progeny. We also noted in *Koller* that starting in 1983, another line of cases developed that assigns the burden to the defendant of proving both prejudice and an improper governmental purpose for the delay; we called this line the *Watkins* line, after *United States v. Watkins*, 709 F.2d 475 (7th Cir.1983), and its progeny. This misconception about whether the burden shifts to the government has propagated because we have not had to address this issue directly. Since Sowa has demonstrated actual and substantial prejudice, we are presented with our first legitimate opportunity to settle this issue and alleviate the existing confusion.

The seminal cases analyzing pre-indictment delay in the Due Process context are *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), and *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). Our earlier "line of cases," the *King* line, is drawn directly from these Supreme Court cases. The other "line of cases" extends from a misunderstood statement in *Watkins*. In that case, we held that the defendant, by claiming that only the passage of time had prejudiced

him, did not allege the actual and substantial prejudice necessary to support a Due Process violation. *Watkins,* 709 F.2d at 479. We further made our point by stating: "Watkins [the defendant] failed even to allege an improper government motive for the pre-indictment delay." *Id.* It is this imprecise language in *Watkins* that has served as the basis for the belief that we have two lines of authority on this issue.

That we have permitted this question to go unanswered is easy to explain. First, we have never before found actual and substantial prejudice. Without this threshold issue met, we have not needed to delve into the government conduct issue. Second, in cases in which we feel compelled to discuss the government's explanation for the pre-indictment delay, the record had quite clearly demonstrated that the government's reasons for the delay were entirely acceptable. The record in these cases developed when, in response to the defendant's motion to dismiss the indictment for pre-indictment delay, the government provided a detailed explanation for its delay. The record has been similarly developed in this case. Thus, in cases in which we could not resist discussing the government's conduct, for the sake of thoroughness, the record has provided us with all we needed to know, regardless of which party bore the burden. We recognize, however, that since the burden shifting issue has not properly been before us, much of what we have said about it in prior cases must be characterized as *dicta.*

Having identified how this misconception arises, we can properly address the issue of which party bears the burden with respect to the government's conduct. In *Marion,* the Supreme Court held that pre-indictment delay did not implicate the Sixth Amendment right to a speedy trial; it indicated, however, that the Due Process clause of the Fifth Amendment might be implicated if there is prejudice and the government has used the prejudice to its tactical advantage. In *Lovasco,* the Court held that even if a defendant proves prejudice, due process is not violated if the government's delay is due to further investigation to solidify its case. Consistent with *Marion,* the Court in *Lovas-*co indicated that nothing short of bad faith by the government in turning the prejudice to its tactical advantage will rise to the level of a due process violation.

In light of this precedent, once the defendant has proven actual and substantial prejudice, the government must come forward and provide its reasons for the delay. The reasons are then balanced against the defendant's prejudice to determine whether the defendant has been denied due process. This procedure is commanded not only by precedent, but by logic. Once the defendant has cleared the monumental hurdle of proving prejudice, the government should explain its reasons. How else is the defendant to know why the government waited so long to indict him? In addition, this is not a heavy burden for the government to bear; their standard practice in responding to motions to dismiss for pre-indictment delay is to explain the delay. And, as indicated by *Lovasco,* if the cause of the delay is legitimately investigative in nature, a court will not find a due process violation.

Here, the government explained that the delay was caused by the difficulty in investigating this crime. First, the government decided to wait until the termination of the state prosecution. We have repeatedly held that this is a valid exercise of prosecutorial discretion. *See, e.g., Koller,* 956 F.2d at 1416 (citations omitted). Second, the state investigation turned up very little useful evidence. Finally, more evidence was necessary to sustain a federal conviction; the federal investigators not only had to identify Sowa as the assailant, but also attribute a racial motive to his crime. These factors essentially compelled the federal investigators to start from scratch.

Obtaining evidence against Sowa was exceptionally difficult given that virtually all of the witnesses were friends of Sowa. Once the government identified a reliable witness, however, they completed their investigation, and the grand jury returned an indictment within ten months. The Supreme Court unequivocally approved a delay for further investigation in *Lovasco.* Considering that the prejudice to Sowa was at least partially a consequence of his own behavior and the

strength of the government's reasons for the delay, we agree with the district court that Sowa suffered no due process violation.

Next, Sowa argues (albeit halfheartedly) that the district court erred when it denied him the use of peremptory challenges with respect to certain black venirepersons. He claims that his counsel offered valid, racially-neutral reasons for exercising his peremptory challenges. The district court disagreed, and so do we.

■ A prosecutor may not exercise his peremptory challenges to strike a venireperson on the basis of his race. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Georgia v. McCollum,* —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Supreme Court extended this prohibition to the defendant in criminal cases. We evaluate claims that an opponent has used peremptory challenges in a way that violates the Equal Protection clause within the now-familiar *Batson* framework. First, the objecting party must establish a *prima facie* case that peremptory challenges were used to exclude a prospective juror on the basis of race. *Batson,* 476 U.S. at 96–97, 106 S.Ct. at 1722–23. Once the *prima facie* case has been established, the burden shifts to the party exercising the peremptory challenge to articulate a racially-neutral explanation for striking the particular juror in question. *Id.* at 97–98, 106 S.Ct. at 1723–24. Finally, the court must determine whether the objecting party has carried his burden of proving purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1724. The decisive question with respect to a *Batson* violation is "whether counsel's race-neutral explanation ... should be believed." *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991). Because the determination of whether the exercise of a peremptory challenge was racially motivated is one of fact, we review the district court's decision on this matter for clear error.

■ During voir dire, Sowa's counsel attempted to exercise peremptory challenges against every black venireperson, of which there were six. The government objected to his exercise of four challenges on the ground that there was no racially-neutral reason to

challenge these jurors. The district court carefully considered the government's objections and Sowa's counsel's purported racially-neutral reasons. In a separate memorandum opinion and order specifically articulating his findings, the district court found that the reasons proffered with respect to three black venirepersons were pretextual. The record clearly supports the district court's findings.

The government easily made its *prima facie* case that the peremptory challenges were motivated by race; each and every black venireperson was challenged. It objected to four of these challenges. In response to these objections, Sowa's counsel proffered racially-neutral reasons for challenging these four black venirepersons. With respect to three, Sowa's counsel articulated characteristics that he argued warranted exclusion of the black venirepersons; these characteristics also happened to be present in at least one unchallenged white venireperson. This record is clear that Sowa's counsel's strategy was to exclude as many blacks as possible and that the reasons he proffered were unimaginative and unconvincing. The district court's thorough memorandum exposes Sowa's counsel's proffered reasons as a pretext and a sham, and we affirm its findings in all respects regarding these challenges.

Finally, Sowa complains that the district court improperly admitted certain hearsay statements. Antoinette Caruso testified that her granddaughter Erika, then three years old, saw Sowa beat Dodds, cried for twenty minutes, and then identified Sowa as the assailant. The district court admitted this testimony under Rule 803(2) of the Federal Rules of Evidence as an excited utterance. The substance of Sowa's argument against admissibility is that a statement made twenty minutes after a startling event is too long to satisfy the excited utterance exception to the hearsay rule.

■ Rule 803(2) provides an exception to the hearsay rule for any "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The basis of the excited utterance exception

453

is that "such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation...." *Idaho v. Wright*, 497 U.S. 805, 820, 110 S.Ct. 3139, 3149, 111 L.Ed.2d 638 (1990). For a hearsay statement to be admitted under this exception, three conditions must be met: 1) a startling event must have occurred; 2) the declarant must have made the statement while under the stress of excitement caused by the event; and 3) the statement must relate to the startling event. *United States v. Hartmann*, 958 F.2d 774, 784 (7th Cir.1992) (quoting *United States v. Moore*, 791 F.2d 566, 570 (7th Cir.1986)). There is no question in this case that the bloody beating with a baseball bat constitutes a startling event or that the child's identification of the assailant relates to the event. We, therefore, focus on the second condition of admissibility.

Antoinette Caruso testified as follows. She saw, through her basement window, two white men beat two black men with baseball bats, but could not identify the white men because she was not wearing her glasses. At this time, Erika was also looking out the window at the beating. Erika began to shake and started to cry. Antoinette pulled Erika away from the window while her husband called the police. With Erika in her arms, she then went across the street to determine whether the victim was alive. Antoinette returned to her porch, and Erika continued to cry. After about twenty minutes, Erika asked, "Can we pray for that man [Dodds]?" Antoinette responded, "Of course." Erika then asked, "Can we pray for Junior [Sowa], too?" When Antoinette asked why, Erika responded, "Because Junior did this Grandma. I saw him."

▆▆▆▆ Sowa makes much of the twenty minute interval between the time of the beating and Erika's statement, but he misperceives the nature of the exception. While the time element is important, it is not controlling. *Gross v. Greer*, 773 F.2d 116, 120 (1985) (citations omitted). Particularly with respect to a child declarant, the relevant inquiry is whether the statements "were made under such circumstances and so recently after the occurrence of the transaction

as to preclude the idea or reflection or deliberation." *Id.* In this case, the description by Antoinette Caruso of the circumstances surrounding Erika's statements indicates nothing that might lead us to believe that Erika was coached with respect to the ramifications of her statements. That Erika cried for twenty minutes demonstrates the effect that witnessing this crime had on her. Considering the circumstances, the indicia of reliability regarding Erika's statements is quite high. Indeed, compared to the *Gross* case, in which the four-year-old declarant identified the presence of the defendant at the scene of the crime over twelve hours after the commission of the crime, the twenty minutes that elapsed between the beating and Erika's statements is inconsequential. The district court, therefore, properly admitted Erika's statement pursuant to the excited utterance exception to the hearsay rule.

### III. Conclusion

For the foregoing reasons, Sowa's conviction is

AFFIRMED.