******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., with whom McDONALD, J., joins as to part I, concurring. I concur in the opinion of the court. I write separately to elaborate on the analysis, contained in part I of the court's opinion, used to adjudicate a claim that a defendant's due process rights secured by the state constitution were violated by a prearrest delay.[1] I also will briefly express my views regarding the proper treatment of the hearsay statements of the deceased witness in the context of this case.

## I

### PREARREST DELAY

The defendant, Willie McFarland, claims that the thirty-two year delay between the commission of the murders of which he was convicted and his arrest violated his right to a fair trial under the due process clauses of the federal and state constitutions. I begin my examination of this claim by reference to the analysis used by the trial court when it denied the defendant's motion to dismiss based on the same claim. With respect to the federal constitution, the trial court recognized that there is a split of authority as to the governing test. The differences include subtleties and variations that will be elaborated in the course of this opinion but can be readily summarized. A majority of federal courts of appeals, joined by many state courts when adjudicating federal due process claims, apply a stringent, two-pronged test: to establish that a prearrest delay offends due process, the defendant bears the burden of proving both that he suffered actual and substantial prejudice as a result of the delay *and* that the government engaged in the delay intentionally and for wholly unjustified or

---

[1] In the due process context, courts generally use the terms "prearrest delay," "preindictment delay," and "preaccusation delay" interchangeably to refer to the lapse in time between the occurrence of a crime and a formal charge being brought against the defendant for committing that crime.

bad faith purposes, such as to gain an unfair tactical advantage or to harass the defendant.

By contrast, a minority of federal courts of appeals and a significant number of other state courts deciding federal or state due process claims apply a more flexible balancing test under which the defendant still must establish that the delay caused actual and substantial prejudice at trial, but, once such a showing is made, the burden shifts to the government to explain the reasons for the delay. To decide the constitutional claim, the court then balances the prejudice to the defendant against the government's proffered explanations and justifications for delay.

The balancing test is less stringent than the two-pronged test in three ways. Although both tests require the defendant to demonstrate actual and substantial prejudice as a result of the prearrest delay, (1) the balancing approach imposes on the government the burden of explaining the reason for the delay in the arrest and prosecution of the defendant, (2) a delay may be deemed impermissible under the balancing approach if the proffered reasons for the delay are wholly unjustifiable, even in the absence of intentional bad faith on the part of the government, and (3) as with the closely related sixth amendment right to a speedy trial, the ultimate determination of whether the delay denied the defendant a fair trial involves balancing the government's reasons for the delay against the prejudice to the defendant.

The trial court concluded that Connecticut has adopted the majority interpretation of the federal due process clause in *State* v. *Morrill*, 197 Conn. 507, 522, 498 A.2d 76 (1985), and that the defendant in the present case was unable to prevail under the two-pronged test because, regardless of any prejudice, he conceded that there was no evidence that the state had delayed in

arresting him to obtain an unfair tactical advantage or for other improper purposes. After conducting a thorough *Geisler* analysis, however; see *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992); the trial court concluded that the state constitution confers broader protections in this regard and that Connecticut courts would apply a balancing test to claims brought under the due process clauses of the state constitution. Still, the trial court determined that the defendant could not prevail under the balancing test on this record. Even assuming, for the sake of argument, that the defendant had suffered prejudice, the court held that the prearrest delay was wholly justified because the state promptly initiated the prosecution once newly developed DNA technologies established that the defendant was involved in the murders of the victims, Fred Harris and Gregory Harris.

On appeal, the defendant contends that we should confirm the trial court's conclusion that a balancing test is necessary to satisfy due process under the state constitution or, alternatively, repudiate *Morrill* and its progeny and adopt the minority view as to the federal due process clause. Under either approach, he argues that he should prevail because the trial court misapplied the balancing test, and a proper analysis demonstrates that he was denied the right to a fair trial. This court agrees with the defendant that the due process clauses of the state constitution require the application of a balancing test that involves consideration of all of the circumstances relevant to both the causes and consequences of the prearrest delay.[2] Applying that test, however, this court also agrees with the trial court that the defendant failed to establish that he was denied a fair trial.

---

[2] Because this court concludes that the defendant is entitled to application of the balancing test under the state constitution, we do not revisit our interpretation of the proper legal analysis under the federal constitution.

## A

### Scope of State Due Process Protections

Relying on *State* v. *Hodge*, 153 Conn. 564, 568, 219 A.2d 367 (1966), the defendant contends that this court already has recognized that, to determine whether a prearrest delay transgresses due process limitations under our state constitution, we apply a totality of the circumstances test that is more flexible than the two-part test used by most federal courts. Although I agree in substance with this reading of *Hodge*, we also must acknowledge that *Hodge* was decided before *State* v. *Geisler*, supra, 222 Conn. 672, and it did not analyze the state constitutional issue in any depth or consider the factors that we subsequently identified as relevant in *Geisler*. See id., 684–85. It is therefore appropriate, in my view, "to engage in a more robust consideration" of the state constitutional claim in the present case. *State* v. *Langston*, 346 Conn. 605, 625, 294 A.3d 1002 (2023), cert. denied,     U.S.    , 144 S. Ct. 698, 217 L. Ed. 2d 391 (2024); see, e.g., id., 624–25.

"In [*Geisler*], we identified six nonexclusive tools of analysis to be considered, to the extent applicable, whenever we are called on as a matter of first impression to define the scope and parameters of the state constitution: (1) persuasive relevant federal precedents; (2) historical insights into the intent of our constitutional forebears; (3) the operative constitutional text; (4) related Connecticut precedents; (5) persuasive precedents of other states; and (6) contemporary understandings of applicable economic and sociological norms, or, as otherwise described, relevant public policies." *State* v. *Santiago*, 318 Conn. 1, 17–18, 122 A.3d 1 (2015). We have also observed, however, that "[i]t is not critical to a proper *Geisler* analysis that we discuss the various factors in any particular order or even that we address each factor." (Internal quotation marks

omitted.) *O'Shea* v. *Scherban*, 339 Conn. 775, 797, 262 A.3d 776 (2021). I will focus on the four factors that I consider most useful to the resolution of the issue presented in this case.

## 1

## Connecticut Precedent

I agree with the defendant that Connecticut precedent carries substantial weight in the present case because it provides solid support for the trial court's conclusion that excessive prearrest delay claims are assessed according to a balancing test, which takes all relevant circumstances into account, under the state constitution.[3]

In *Hodge*, the defendant contended that a three week delay between the commission of the narcotics offense and his arrest constituted an unreasonable seizure of his person, in violation of the predecessor to article first, § 7, of the 1965 Connecticut constitution. See *State* v. *Hodge*, supra, 153 Conn. 566–67. Although at trial the defendant in *Hodge* had challenged the legality of only the seizure, this court characterized the constitutional issue more broadly: "[When] the delay in arresting a defendant (or in otherwise apprising him of the charges against him) continues long after all the evidence has been assembled, and becomes a product of mere convenience to the state, a question of an unreasonable seizure *or lack of a fair trial* may arise." (Emphasis added.) Id., 567–68. *Hodge* found support for this proposition in *Ross* v. *United States*, 349 F.2d 210 (D.C. Cir. 1965), one of the first cases in the country to hold that a delay

[3] The question under this *Geisler* factor is not whether there is controlling precedent establishing that broader protection has been found to exist under the state constitution, but whether there is any basis in the holdings or dicta of our decisions, or those of the Appellate Court, that supports adopting such broader protection. See, e.g., *State* v. *Wilkins*, 240 Conn. 489, 505, 692 A.2d 1233 (1997).

in bringing an indictment violated a defendant's due process rights. See *State* v. *Hodge*, supra, 567–68; see also *Ross* v. *United States*, supra, 211–13. *Ross* assessed the due process claim according to a balancing test. See, e.g., *Ross* v. *United States*, supra, 213 ("When interests of this nature impinge [on] each other, as they have a way of doing, they must be accommodated. A balance must be struck, if one or the other is not to be sacrificed completely."). In *Hodge*, this court applied the due process analysis used in *Ross* as "to a claim of an unreasonable seizure brought under our state constitution." *State* v. *Hodge*, supra, 568.

Having thus framed the issue, *Hodge* adopted the following test for claims of prearrest delay under the state constitution: "The defendant's rights under this claim must necessarily depend on all the circumstances, including the length of the delay, the reason for the delay, prejudice to the defendant, and a timely presentation of the claim to the trial court. Some prejudice to the defendant's case must be shown. . . . Such prejudice might consist of the unavailability of alibi witnesses or the impaired memory of the defendant and others who vouch for his innocence." (Citation omitted.) Id.

This *Hodge* test is almost verbatim the test that this court uses to assess other constitutional claims arising from delayed prosecution, such as alleged violations of the sixth amendment right to a speedy trial. Compare id. ("the length of the delay, the reason for the delay, prejudice to the defendant, and a timely presentation of the claim to the trial court"), with *Barker* v. *Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) (considering "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant" to determine whether speedy trial right was violated). See also *Gaines* v. *Manson*, 194 Conn. 510, 527–28 and n.15, 481 A.2d 1084 (1984) (applying *Wingo* test to alleged violations of right to timely prose-

cution of appeal under due process clause of state constitution). The United States Supreme Court repeatedly has referred to that nearly identical totality of the circumstances test as a balancing test. See, e.g., *Barker* v. *Wingo*, supra, 530 ("[t]he approach we accept is a balancing test").

*Hodge* thus stands for the proposition that prearrest delay claims alleging the deprivation of the right to a fair trial under the state constitution are subject to a balancing test. While *Hodge* left open some questions about how the balancing test would apply, I think *Hodge* makes clear that intentional bad faith on the part of the state is not an absolute precondition to a due process violation, while also recognizing that "[a] reasonable delay . . . may be a proper adjunct to responsible police investigation and should not undermine the legality of subsequent arrests and convictions except under unusual and clearly prejudicial circumstances." *State* v. *Hodge*, supra, 153 Conn. 569. The court in *Hodge* noted that "[o]rdinarily a delay between the time of an offense and the time of making an arrest will not affect the legality of the arrest or of the criminal proceedings subsequent thereto" insofar as, "[o]ften a lengthy delay is required because the identity of the offender is unknown to the authorities or because additional time is needed to gather sufficient evidence to justify an official charge against one who is suspected of crime." Id., 567. *Hodge* also recognized that "the applicable statute of limitations is the ultimate safeguard against a [long delayed] arrest and prosecution." Id.

After this court's decision in *Hodge*, the United States Supreme Court issued a series of opinions clarifying that an unjustified delay in initiating a prosecution also can violate a defendant's right to due process under the federal constitution. See *United States* v. *Lovasco*, 431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977); *United States* v. *Marion*, 404 U.S. 307, 92 S. Ct. 455, 30

L. Ed. 2d 468 (1971). As I will discuss, a majority of the lower federal courts and state courts—including this court—have read *Marion* and *Lovasco* to require that, in order to successfully challenge a prearrest delay under the federal due process clauses, a criminal defendant must satisfy both prongs of the relatively stringent, two-pronged test. For example, in *State* v. *Morrill*, supra, 197 Conn. 522, this court construed *Marion* and *Lovasco* to mean that, "[i]n order to establish a due process violation because of [preaccusation] delay, the defendant must show both that actual substantial prejudice resulted from the delay and that the reasons for the delay were wholly unjustifiable, as where the state seeks to gain a tactical advantage over the defendant." The discussion in *Morrill*, however, was confined to the federal constitution; the court did not address whether the state constitution affords broader due process protections, and it did not mention *Hodge*, let alone purport to overrule it. The fact that this court already has articulated a rule that affords greater protection under the state constitution than does the prevailing federal rule strongly counsels in favor of upholding the trial court's determination that a balancing test provides the proper analytical framework for consideration of the defendant's state constitutional claim.

2

Persuasive Federal and State Court Authority

There is significant disagreement among both federal and state courts regarding the correct legal standard applicable to due process claims arising from prearrest delay. Most of the federal courts of appeals have interpreted *Marion* and *Lovasco* to mean that, under the federal constitution, the defendant bears the burden of establishing both that (1) he suffered actual and substantial prejudice as a result of the delayed prosecution, and (2) the delay was tactical, intended to harass,

or otherwise a purposeful manifestation of bad faith on the part of the government. However, three federal courts of appeals—the fourth, seventh, and ninth circuits—have instead adopted some form of multifactor balancing test, more akin to the *Hodge* test. See, e.g., *United States* v. *Sowa*, 34 F.3d 447, 451 (7th Cir. 1994), cert. denied, 513 U.S. 1117, 115 S. Ct. 915, 130 L. Ed. 2d 796 (1995); *Howell* v. *Barker*, 904 F.2d 889, 895 (4th Cir.), cert. denied, 498 U.S. 1016, 111 S. Ct. 590, 112 L. Ed. 2d 595 (1990); *United States* v. *Moran*, 759 F.2d 777, 782–83 (9th Cir. 1985), cert. denied, 474 U.S. 1102, 106 S. Ct. 885, 88 L. Ed. 2d 920 (1986). This persistent circuit split is noteworthy.[4]

Although different panels of these circuits have articulated and applied their respective tests somewhat differently, they all tend to depart from the majority approach in three important respects. First, these circuits hold that, once a defendant has established that he has been *actually and substantially* prejudiced by a delayed prosecution,[5] the burden shifts to the govern-

---

[4] Whereas the party arguing for broader protections under the state constitution typically is confined to arguing that United States Supreme Court concurring and dissenting opinions are more persuasive than the relevant majority opinions, in this case, even those federal courts that adhere to the majority approach acknowledge that the controlling opinions—*Marion* and *Lovasco*—are ambiguous. See, e.g., *United States* v. *Crouch*, 84 F.3d 1497, 1510 (5th Cir. 1996) ("[w]e recognize that neither *Marion* nor *Lovasco* is crystal clear on this issue, and each opinion contains some language that can give comfort to either view"), cert. denied, 519 U.S. 1076, 117 S. Ct. 736, 136 L. Ed. 2d 676 (1997), and cert. denied sub nom. *Frye* v. *United States*, 519 U.S. 1076, 117 S. Ct. 736, 136 L. Ed. 2d 676 (1997); *Stoner* v. *Graddick*, 751 F.2d 1535, 1542 (11th Cir. 1985) (*Lovasco* "strongly hinted" that bad faith is necessary component of successful due process challenge). The high court has declined to resolve the circuit split, allowing the federal courts of appeals to adopt different interpretations and to apply conflicting standards for one-half century without ever repudiating the minority approach. See, e.g., *Barker* v. *Howell*, 498 U.S. 1016, 111 S. Ct. 590, 112 L. Ed. 2d 595 (1990) (denying petition for writ of certiorari).

[5] Demonstrating actual and substantial prejudice requires the defendant to establish that the delay has compromised his ability to mount a defense, and not merely that certain evidence was lost to him. See, e.g., *United States* v. *McMutuary*, 217 F.3d 477, 482 (7th Cir.) (death of alibi witness did not

ment to explain and justify the delay. See, e.g., *United States* v. *Sowa*, supra, 34 F.3d 451. The rationale for this rule is that whichever party is privy to the relevant information should bear the burden of proof. See, e.g., id.; see also *State* v. *Swebilius*, 325 Conn. 793, 807–808, 159 A.3d 1099 (2017) (requiring that each party "bring forth evidence uniquely within its knowledge" "allocates burdens efficiently" and "encourages diligence by law enforcement"). The defendant is best positioned to establish whether, and to what extent, the delayed prosecution caused prejudice, but only law enforcement and prosecutors know the reason for the delay. See, e.g., *United States* v. *Sowa*, supra, 451 ("Once the defendant has cleared the monumental hurdle of proving prejudice, the government should explain its reasons. How else is the defendant to know why the government waited so long to indict him?"). To require the defendant to establish why individual public officials chose to delay arresting him "would violate fundamental conceptions of justice, as well as the community's sense of fair play." *Howell* v. *Barker*, supra, 904 F.2d 895; see also *United States* v. *Sabath*, 990 F. Supp. 1007, 1018 (N.D. Ill. 1998) ("The circuits that require a showing of intentional bad faith delay to gain a tactical advantage over the defendant seem to set an impossible threshold for criminal defendants. No defendant can get into the mind of a prosecutor to determine why a case was delayed . . . .").

Second, for a prearrest delay to violate due process under the minority rule, it is not necessary for the government to have delayed in making the arrest for tactical reasons or otherwise to have demonstrated bad faith. A lengthy delay may be deemed unjustified when it results from recklessness, or (in some jurisdictions)

cause actual and substantial prejudice because "[h]er testimony would have been largely cumulative of" other witness' testimony), cert. denied, 531 U.S. 1001, 121 S. Ct. 502, 148 L. Ed. 2d 471 (2000).

even negligence, on the part of public officials. See, e.g., *Howell* v. *Barker*, supra, 904 F.2d 895; *United States* v. *Moran*, supra, 759 F.2d 781.[6]

Of course, the government is not obliged to bring a prosecution as quickly as possible; see, e.g., *United States* v. *Lovasco*, supra, 431 U.S. 790–91; and there should be a "safe harbor" for public officials as they investigate a crime, wait for evidence to ripen, and build a sufficiently strong case to warrant a prosecution. *United States* v. *Sample*, 565 F. Supp. 1166, 1183 (E.D. Va. 1983); see also *United States* v. *Sowa*, supra, 34 F.3d 451 ("if the cause of the delay is legitimately investigative in nature, a court will not find a due process violation"). It is highly desirable for the government to proceed carefully and cautiously, and there should be no pressure to bring charges out of fear that any delay will be subject to judicial second-guessing. Within reasonable limits, our doctrine on prearrest delay should reflect both the value of prudent caution and the need to honor prosecutorial discretion in this context.

Third, to resolve the ultimate question of whether a delayed prosecution has deprived the defendant of the opportunity for a fair trial, the fourth, seventh, and ninth circuits balance the nature and extent of the actual and substantial prejudice against the causes and justifications proffered by the government for the delay. As this court did in *Hodge*, these federal courts, in conducting this balancing, consider all of the relevant facts and

---

[6] In some of its more recent articulations of the rule under the federal constitution, the United States Supreme Court itself has indicated that recklessness on the part of the government, and not only intentional bad faith, also can be sufficient to satisfy the second prong of the strict, two-pronged test. See, e.g., *United States* v. *Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in United States Currency*, 461 U.S. 555, 563, 103 S. Ct. 2005, 76 L. Ed. 2d 143 (1983) ("such claims can prevail only upon a showing that the [g]overnment delayed seeking an indictment in a deliberate attempt to gain an unfair tactical advantage over the defendant *or in reckless disregard of its probable prejudicial impact*"(emphasis added)).

circumstances of the particular case. See, e.g., *Howell* v. *Barker*, supra, 904 F.2d 895; *United States* v. *Valona*, 834 F.2d 1334, 1339 (7th Cir. 1987); *United States* v. *Mays*, 549 F.2d 670, 678 (9th Cir. 1977). To assess whether the defendant has established actual and substantial prejudice, courts examine factors such as the length of the delay, the nature and seriousness of the prejudice, the strength of the government's case, and whether the prejudice could be and was mitigated. See, e.g., J. Caplan, Note, "Better Never Than Late: Pre-Arrest Delay as a Violation of Due Process," 1978 Duke L.J. 1041, 1048–53. On the justification side of the scale, these courts consider the motive for the delay, its reasonableness, any role that the defendant played in causing the delay, whether the claim was timely raised, and any extraordinary factors supporting prosecution after the passage of a long period of time. See, e.g., id., 1043–57.

The federal courts using this approach often frame this balancing test as one in which the greater the prejudice to the defendant, the higher the burden on the government to establish a valid reason for the delay, and vice versa. See, e.g., *United States* v. *Mays*, supra, 549 F.2d 678 ("[t]he greater the length of the delay and the more substantial the actual prejudice to the defendant becomes, the greater the reasonableness and the necessity for the delay will have to be to balance out the prejudice"); see also *United States* v. *Sample*, supra, 565 F. Supp. 1183. The ultimate determination often is characterized, as it was in *Lovasco*, in terms of whether a delayed prosecution "violates those fundamental conceptions of justice [that] lie at the base of our civil and political institutions . . . and [that] define the community's sense of fair play and decency . . . ." (Citations omitted; internal quotation marks omitted.) *United States* v. *Lovasco*, supra, 431 U.S. 790; accord

*Howell* v. *Barker*, supra, 904 F.2d 895; see also *United States* v. *Moran*, supra, 759 F.2d 782.

There likewise are variations among the state courts in their respective approaches to due process limitations on prearrest delay. Although a majority apply some version of the strict, two-pronged test, under which a defendant bears the burden of establishing both prejudice and purposeful, ill-intentioned delay, more than one third of the states instead use a multifactor or balancing test under either the federal due process clauses or their respective state counterparts. See, e.g., E. DuBosar, Note, "Pre-Accusation Delay: An Issue Ripe for Adjudication by the United States Supreme Court," 40 Fla. St. U. L. Rev. 659, 671–85 (2013). Despite the existence of some nuanced distinctions, the states that employ the balancing test all agree with the minority federal approach that (1) the state carries the burden of demonstrating the reasons for the delay because it is best positioned to explain and justify long delays in charging the defendant, (2) the prejudicial consequences of delay on the defense can render a criminal prosecution fundamentally unjust if the state waits decades to initiate proceedings without any valid reason, and not only when the delay is tactical or malicious, and (3) the ultimate determination of whether a due process violation has occurred must involve consideration of all of the relevant circumstances surrounding the delay— including its causes and consequences—and weighing the state's justifications for the delay against the prejudice suffered by the defendant. See, e.g., *People* v. *Nelson*, 43 Cal. 4th 1242, 1255, 185 P.3d 49, 78 Cal. Rptr. 3d 69 ("The ultimate inquiry in determining a claim based [on] due process is whether the defendant will be denied a fair trial. If such deprivation results from unjustified delay by the prosecution coupled with prejudice, it makes no difference whether [or not] the delay was deliberately designed to disadvantage the defen-

dant . . . . [In either case], the defendant will be denied his right to a fair trial as a result of governmental conduct."), cert. denied, 555 U.S. 926, 129 S. Ct. 357, 172 L. Ed. 2d 219 (2008).

The overwhelming majority of the courts that follow the stringent, two-pronged approach provide no meaningful explanation at all and offer no supporting analysis grounded in the language, history, or purpose of the federal due process clauses. They merely purport to apply what they take to be the better reading of the high court's brief discussion of the issue in *Marion* and *Lovasco*. By contrast, those jurisdictions that use a totality of the circumstances or balancing test have explained at some length why applying the two-pronged test makes little sense. See, e.g., *State* v. *Purcell*, 331 Conn. 318, 348–51, 203 A.3d 542 (2019) (affording little weight to majority of state courts that simply endorsed majority opinion of United States Supreme Court without independently assessing its persuasiveness). Accordingly, these factors also counsel in favor of applying the *Hodge* test in the present case.

3

Constitutional Text and History

*Geisler* also instructs that we examine the text and history of the relevant constitutional provisions. In the present case, these factors are consistent with, but provide limited direct support for, a broader reading of the state constitution.

The state constitution contains two due process clauses. Article first, § 8, of the Connecticut constitution provides in relevant part that "[n]o person shall . . . be deprived of life, liberty or property without due process of law . . . ." That language closely tracks the language of the due process clauses contained in the fifth and fourteenth amendments to the federal constitu-

tion and, thus, does not provide any independent support for the defendant's position. At the same time, we have long recognized that article first, § 8, has a distinct meaning that, in various contexts, operates to confer broader due process protections than does the fourteenth amendment.[7] "[W]e have long abandoned the notion that our state due process clause . . . has the same meaning and imposes the same limitations as its federal counterpart." (Citation omitted; footnote omitted.) *State* v. *Morales*, 232 Conn. 707, 717, 657 A.2d 585 (1995).

Article first, § 9, by contrast, has no direct federal counterpart. See W. Horton, The Connecticut State Constitution (2d Ed. 2012) p. 75. It provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law." Conn. Const., art. I, § 9. It is well established that this provision confers distinct rights on the citizens of Connecticut. See, e.g., *State* v. *Santiago*, supra, 318 Conn. 14–15 (prohibiting capital punishment following prospective abolishment by legislature); see also *State* v. *Boyd*, 221 Conn. 685, 689–90, 607 A.2d 376, cert. denied, 506 U.S. 923, 113 S. Ct. 344, 121 L. Ed. 2d 259 (1992). But, again, nothing in the language of the provision directly addresses the issue of prearrest delays.

I consider it relevant that the balancing test that the trial court applied in the present case is far from a novel

---

[7] See, e.g., *State* v. *Purcell*, supra, 331 Conn. 321 (police officers are required to clarify ambiguous request for counsel before continuing custodial interrogation); *State* v. *Harris*, 330 Conn. 91, 115, 191 A.3d 119 (2018) (adopting heightened standard and burden shifting framework for reliability of eyewitness identification under due process clause of state constitution); *State* v. *Morales*, supra, 232 Conn. 726–27 (rejecting "the litmus test of bad faith on the part of the police," which United States Supreme Court had adopted under federal constitution, to determine whether state's failure to preserve evidence violates due process protections under state constitution); *State* v. *Stoddard*, 206 Conn. 157, 166, 537 A.2d 446 (1988) ("a suspect must be informed promptly of timely efforts by counsel to render pertinent legal assistance").

interpretation of the "due process of law" language of article first, § 8. See, e.g., *State* v. *Morales*, supra, 232 Conn. 721 (citing *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), under which procedural due process violations are subject to a test that balances (1) private interest at issue, (2) risk of erroneous deprivation and probable value of additional safeguards, and (3) government's interests, including administrative and financial burdens of additional safeguards). "Indeed," as this court explained in *Morales*, "we frequently have rejected a litmus test that [requires the satisfaction of one particular element, such as bad faith], and instead have required courts to employ a balancing test, when ruling on issues that concern due process or fundamental fairness." Id., 720.

With respect to the historical analysis under *Geisler*, there is little guidance to be found, one way or the other, in our state's preconstitutional practice and traditions. The parties have not identified any instances of lengthy prearrest delays in colonial Connecticut, and the scenario presented by this case—a decades old cold case that suddenly came alive again in 2018 due to increasingly sensitive DNA technologies—is of distinctly modern origin. That said, the underlying principles are anything but new. The concept that criminal justice ought not be unnecessarily delayed traces to the Magna Carta, a charter of liberty that indelibly influenced our own notions of due process. See, e.g., *State* v. *Pace*, 129 Conn. 570, 572, 29 A.2d 755 (1943) ("[t]he right of one accused of crime to have a fair and impartial trial has been the basis of Anglo-Saxon criminal jurisdiction ever since [the] Magna Carta"). As one English jurist long ago expressed the unfairness associated with undue delay, "[i]t is monstrous to put a man on his trial after such a lapse of time. How can he account for his conduct so far back? . . . No man's life would be safe if such a prosecution were permitted. It would be very

unjust to put him on his trial." *Regina* v. *Robins*, 1 Cox Crim. Cas. 114 (Somerset Winter Assizes 1844). Connecticut's earliest legal codes likewise embraced the principle that justice should be delivered "without partiality or delay." (Internal quotation marks omitted.) C. Collier, "The Common Law and Individual Rights in Connecticut Before the Federal Bill of Rights," 76 Conn. B.J. 1, 12 (2002); see id., 12 n.23 (citing "the Code of 1672" of Connecticut Colony). And there is no doubt that, in the decade leading up to the adoption of our present constitution in 1965, prior to *Marion* and *Lovasco*, the prevailing approach to the issue, as in *Hodge*, was to consider and balance various factors, including the length of the delay, the reasons for the delay, and the prejudice to the defendant engendered by the delay. See, e.g., *Ross* v. *United States*, supra, 349 F.2d 211; *Taylor* v. *United States*, 238 F.2d 259, 260–62 (D.C. Cir. 1956); *Territory* v. *Shito*, 43 Haw. 203, 205–206 (1959).

4

Relevant Public Policies

I have explained why I find more persuasive the reasoning of those courts that apply a balancing test to guide the due process analysis. In this part, I address the state's primary arguments against adopting a balancing test.

One worry articulated by the state is that the balancing test would allow perpetrators to go unpunished if they are fortunate enough to face a long delayed prosecution resulting from unexplained causes. That concern, while understandable, overlooks the demanding threshold prejudice requirement and has not been borne out in practice. In fact, the courts that apply the balancing approach consistently emphasize both how difficult it is for a defendant to establish a due process violation and how rarely prosecutions are dismissed on this basis.

See, e.g., *United States* v. *Hagler*, 700 F.3d 1091, 1099 (7th Cir. 2012) ("[t]his burden is an exacting one; the showing must rest [on] more than mere speculative harm . . . and [the defendant] must present facts that are specific, concrete, and supported by evidence" (citation omitted; internal quotation marks omitted)); *United States* v. *Barken*, 412 F.3d 1131, 1134 (9th Cir. 2005) ("An indictment is rarely dismissed because delay by the prosecution rises to the level of a [f]ifth [a]mendment due process violation. . . . The defendant's burden [of] show[ing] actual prejudice is heavy and is rarely met." (Citation omitted.)); *United States* v. *Suchecki*, Docket No. 91-10127, 1993 WL 188368, *2 (9th Cir. June 2, 1993) (decision without published opinion, 995 F.2d 234) ("These requirements are stringent and stringently enforced . . . . A recent Ninth Circuit decision found only two cases in the . . . seventeen years [between 1975 and 1992] in which *any* [federal] court of appeals upheld a [preindictment] delay due process claim." (Citations omitted; emphasis in original.)); *Pharm* v. *Hatcher*, 984 F.2d 783, 786 (7th Cir.) ("[i]n fact, we have never found [preaccusation] delay rising to the level of a constitutional violation"), cert. denied, 510 U.S. 841, 114 S. Ct. 125, 126 L. Ed. 2d 89 (1993); *United States* v. *Sample*, supra, 565 F. Supp. 1175 ("the defendant [usually] has difficulty sustaining the burden").

The present matter is a case in point. With thirty-two years having elapsed between crime and arrest, this case involved a lengthy delay during which two third-party culpability witnesses had died, one of whom had specifically and repeatedly implicated different perpetrators in the crimes, memories of an important alibi witness had faded, and key forensic evidence had degraded. And, yet, as I will explain, the length of the delay and the prejudice to the defendant, when balanced against the reasons for the delay, fall short of a

due process violation. The test this court adopts today is not an easy one to satisfy.

A second concern is that, if we put the onus on the state to justify its failure to expeditiously investigate and prosecute a crime, and we then scrutinize not only intentional but also wholly unjustifiable delays involving something less than bad faith, we will place courts in the uncomfortable and unwelcome position of having to assess and, potentially, second-guess discretionary decisions by the police and prosecutors. In this case, for example, there may be a perfectly good reason why police officers did not follow up with witnesses who claimed to have seen the victims alive the weekend after the defendant was incarcerated, or perhaps they did, but records were lost or never made. And it is unreasonable, the argument goes, to expect the police to have documented those decisions or to anticipate having to account for them thirty-two years later, in 2022.

Once again, however, while these concerns are understandable, one-half century of practical experience has largely failed to bear them out. There is no indication that following the minority approach has hindered law enforcement or resulted in practical difficulties in the many jurisdictions that have adopted it. See, e.g., *United States* v. *Sowa*, supra, 34 F.3d 451 ("this is not a heavy burden for the government to bear; [the] standard practice in responding to motions to dismiss for [preindictment] delay is to explain the delay"). If anything, the opposite has been true. See, e.g., D. Rang, Comment, "The Waiting Game: How Preindictment Delay Threatens Due Process and Fair Trials," 66 S.D. L. Rev. 143, 166 (2021) ("as time has moved on, many states have begun to recognize the problems associated with [the strict, two-pronged] test").

The great majority of delays are investigative in nature, especially with respect to crimes for which there

are no statute of limitations, and most jurisdictions recognize a "safe harbor" for credible investigative delays. *United States* v. *Sample*, supra, 565 F. Supp. 1183. Indeed, some of the jurisdictions that interpret the due process clause to require a balancing approach do not even count periods of investigative activity when assessing the existence and length of a delay. See, e.g., *United States* v. *Sabath*, supra, 990 F. Supp. 1019; *People* v. *Grant*, 82 Misc. 3d 991, 1000, 204 N.Y.S.3d 739 (2024). As a practical matter, when state officials believe that they have enough evidence to prosecute a serious crime, they typically proceed to do so expeditiously. When they do not initiate a prosecution, there typically is a good reason to wait. It is rare for the state simply to sit on a case for an extended period of time for no good reason. The relatively few cases nationwide in which charges have been dismissed or convictions reversed due to excessive prearrest delay have not involved courts nitpicking discretionary decisions by the police or prosecutors; rather, the lack of any justification for the delay has been palpable.

A third argument the state offers for preferring a stricter rule is that the balancing approach infringes on the prerogative of the legislature. The theory is that, when the legislature enacts a statute of limitations for a particular crime, or decides that no statute of limitations is appropriate, it is, in effect, conducting a balancing of interests, weighing the seriousness of the crime, the value of repose, society's interest in seeing justice done after many years have passed, and the interests of a wrongly accused individual in having access to sufficiently fresh evidence to be able to mount a defense. Courts should not interfere in this legislative policymaking.

This argument overlooks the fundamental purpose of judicial review, which is to enforce constitutional limitations on legislative enactments and on the execu-

tive enforcement of those enactments. See, e.g., L. Tribe, American Constitutional Law (2d Ed. 1988) §§ 3-3 and 3-4, pp. 29–33 (judicial review extends to executive practice and enforcement, as well as to legislation). For example, with respect to our state constitutional protections against cruel and unusual punishment, which likewise reside within our dual due process clauses, we rejected the argument that we were compelled to accept "the judgment of the legislature—that the death penalty comports with contemporary standards of decency and serves legitimate penological interests—and that to do otherwise [was] to usurp the proper role of the legislature . . . ." *State* v. *Santiago*, supra, 318 Conn. 133. We reasoned that the argument had long been rejected by this court because it "fundamentally misunderstands the well established function and role of judicial review . . . ." Id. "If the fact that an elected legislature had authorized and enacted the punishment in question were enough to insulate it from judicial scrutiny," we explained, then there would be no purpose for a constitutional provision barring the imposition of cruel and unusual punishment. Id., 135. Rather, our own review is both independent in spirit and distinct in nature from the legislative process by which politicians select punishments. See id.

5

## Summary

To summarize, an analysis of the relevant *Geisler* factors persuades me that §§ 8 and 9 of article first of the state constitution afford broader protections from oppressive prearrest delays than the strict, two-pronged approach that we have held is required under the United States constitution. Under this test, the defendant must first establish actual and substantial prejudice. Relevant factors include the length of the delay, the nature and seriousness of the prejudice, including whether the

defendant was substantially prevented from raising or proving a meaningful defense, the strength of the state's case, and whether any prejudice could be and was mitigated. If the defendant establishes actual and substantial prejudice, the burden then shifts to the state to establish the reasons for any excessive delay. Finally, the court must balance the prejudice to the defendant against the justifications for the delay to determine whether the defendant has been deprived of a fair trial.

## B

### Application of the Balancing Test

The remaining task is to apply this balancing test to the facts of the present case. Upon careful review of the totality of the circumstances, I agree with the trial court's determination that the prosecution did not violate the defendant's due process right to a fair trial under the Connecticut constitution.

With respect to prejudice, the trial court assumed, for the sake of argument, that the defendant was prejudiced by the thirty-two year delay. Many courts, even those that apply a stricter due process standard, hold that actual and substantial prejudice can be established when a defendant demonstrates that a deceased witness would have testified in support of an alibi or third-party culpability defense that is not otherwise available, and there is at least a reasonable possibility that the jury would have credited that testimony. See, e.g., *United States* v. *Rogers*, 118 F.3d 466, 475 (6th Cir. 1997) (comparing cases); cf. *United States* v. *McMutuary*, 217 F.3d 477, 482 (7th Cir.) (death of alibi witness did not cause actual and substantial prejudice because "[h]er testimony would have been largely cumulative of" other witness' testimony), cert. denied, 531 U.S. 1001, 121 S. Ct. 502, 148 L. Ed. 2d 471 (2000).

The present case is relatively rare in that we have the sworn statements of a deceased witness, Veronica

Saars-Doyle, indicating firsthand knowledge that the murders were committed by Lee Copeland. Although we do not dispute the trial court's determination that there were serious problems with her testimony,[8] the defendant's own confessions suffer from similar, if less extreme, defects, and Saars-Doyle's testimony could have been bolstered by that of Bruce Hankins, another deceased witness. In addition, at trial, the defendant's primary alibi witness, Louise Salvati, had no present memory of the events in question and could not confirm her 1987 statement to the police that she had seen Gregory Harris alive on August 22, 1987, after the defendant was incarcerated. Potentially important forensic evidence also had been discarded or degraded over the years, further hampering the defendant's effort to develop a third-party culpability defense. The police apparently did not preserve the bloody shirt that the defendant was wearing when he was arrested on charges of sexual assault on August 22, 1987, and the match between the crime scene DNA and Copeland's 2019 DNA sample was deemed "inconclusive"—which could have meant that a person with his DNA profile was as much as 1000 times more likely to be implicated than an unknown individual, leaving the parties with no way to know whether a more accurate estimate would have been obtained when the evidence was fresher.

Upon closer inspection, however, it must also be observed that this showing of prejudice contained significant weaknesses, particularly with respect to what would appear to be the defendant's strongest claim, namely, the death of one or more witnesses who potentially would have testified in support of a third-party culpability defense. The evidence of prejudice suffered from three major deficiencies.

First, it is well established that, for a prearrest delay to offend due process, the delay must be causally

---

[8] See part III of the per curiam opinion.

related to the prejudice. With respect to deceased witnesses, this means that the defendant must establish that the witness died *during or after* the period of delay, so that, but for the delay, the witness likely would have been available to testify. See, e.g., *United States* v. *Crouch*, 84 F.3d 1497, 1518 (5th Cir. 1996), cert. denied, 519 U.S. 1076, 117 S. Ct. 736, 136 L. Ed. 2d 676 (1997), and cert. denied sub nom. *Frye* v. *United States*, 519 U.S. 1076, 117 S. Ct. 736, 136 L. Ed. 2d 676 (1997); *United States* v. *Cheung Kin Ping*, 555 F.2d 1069, 1072–73 (2d Cir. 1977). In this case, the record does not reveal how long Saars-Doyle and Hankins lived after they gave their last police statements, respectively, in 1992 and 1993. It was the defendant's burden to establish these facts, and his failure to do so prevents him from establishing that the delay in prosecution probably caused the requisite actual and substantial prejudice to his defense. The earliest the state plausibly could have prosecuted the defendant was after he confessed to the murders in 1996; on this record, it is not known if Saars-Doyle and Hankins had died by that time.

Second, to establish a viable third-party culpability defense, the defendant would have needed to prove not only that Copeland participated in the commission of the murders, but also that Copeland's involvement meant that the defendant was not involved. See, e.g., *United States* v. *Garcia*, 74 F.4th 1073, 1101–1102 (10th Cir. 2023) (there was no prejudice when defendant and third party could have jointly committed crime), cert. denied sub nom. *Troup* v. *United States*, U.S. , 144 S. Ct. 400, 217 L. Ed. 2d 216 (2023), and cert. denied sub nom. *Gallegos* v. *United States*, U.S. , 144 S. Ct. 608, 217 L. Ed. 2d 324 (2024); see also *State* v. *Berger*, 249 Conn. 218, 236 n.5, 733 A.2d 156 (1999) (third-party culpability doctrine requires acquittal only if jury determines that third party *alone* was responsible for crime). In this case, Saars-Doyle's primary value to the defense,

as a potential third-party culpability witness, would have been diminished by the fact that her testimony was not necessarily inconsistent with the defendant's guilt. In Saars-Doyle's statement to the police on July 23, 1990, she indicated that, in addition to Copeland, Hankins, and herself, a fourth individual, identified only as "Gus," was involved in the crimes. She described Gus as a short Black man[9] who participated in beating and stabbing Fred Harris. Likewise, in his earlier confessions to the police, the defendant indicated that as many as five other individuals assisted him in the murders. The jury may well have found these early statements more credible than the defendant's later statements that he committed the crimes on his own, which would have required him to single-handedly cut up various telephone wires and use them to bind two adult men hand and foot, all while simultaneously holding both men at bay with a steak knife. Accordingly, it is difficult to conclude that Saars-Doyle's unavailability denied the defendant a fair trial because, even if the jury were inclined to believe Saars-Doyle's inconsistent and implausible statements regarding Copeland's culpability, it still could have found that the defendant collaborated with Copeland in committing the murders.

Third, the strength of the state's case, although not overwhelming, does not favor the defendant's claim of actual and substantial prejudice. In most of the cases in which courts have found that a prearrest delay reached the level of a constitutional violation, the case against the defendant was weak and/or circumstantial, and the defendant had a potentially strong alibi or justification defense that was actually and substantially compromised by the delay. In the present case, by contrast, a DNA match placed the defendant at the murder scene, and he reached out repeatedly to the police to

---

[9] The arrest report identifies the defendant as a five foot, six inch Black male.

confess to the crimes, volunteering specific details that had not been made public. To believe that he had no involvement in the crimes, one would have to believe that (1) the defendant learned of those crime scene details by some other means while incarcerated, (2) he chose to use those details to falsely inculpate himself rather than to implicate either the actual perpetrators or some innocent third parties, and (3) the DNA match obtained in 2019 was a false positive or his DNA appeared in the glove by some innocuous means. For all of those propositions to be true seems extraordinarily unlikely. The exculpatory statements of Saars-Doyle, on the other hand, contain multiple, significant flaws that render her account insufficient to call the defendant's guilt into doubt. See part III of the per curiam opinion.

We are left at the end of the prejudice analysis with an extremely long delay, Salvati's lost memory, which precluded her from fleshing out her police report in a way that the jury might have found more compelling, degradation of key DNA evidence, and the loss of other evidence and the fading of other memories with the passage of time. It is a close case, in my view, whether these circumstances suffice to establish actual and substantial prejudice on this record. Like the trial court, however, I will assume, without deciding, that, on this record, there was sufficient prejudice to reach the second step of the analysis and to consider the state's proffered reasons for the delay.

I agree that the state satisfied its burden of establishing that the lengthy delay in prosecuting the defendant was fully justified and, on balance, defeated the defendant's claim of an unfair trial. The defendant concedes that the state did not act out of bad faith or with other impermissible motives. Nor is there any indication that the delay resulted from the state's reckless disregard of the defendant's rights. Rather, the trial court found

that the state reasonably could have determined that it lacked sufficient evidence to establish the defendant's guilt beyond a reasonable doubt until newly developed DNA technologies linked him to the crimes in 2019, substantiating his earlier confessions. I therefore can attribute no fault to the state for causing the delay. See, e.g., *People* v. *Nelson*, supra, 43 Cal. 4th 1256 (concluding that lengthy delay in bringing murder charges had "strong" justification and balanced out prejudice to defendant, even though he was identified as suspect shortly after murder, because case was "not fully solve[d]" until comparison of defendant's DNA to crime scene evidence twenty-six years later).

The defendant appears to claim that, at the very least, the state acted negligently, such as by failing to timely collect DNA samples from Hankins and Copeland, and by not keeping the yellow work glove, from which the DNA sample was obtained, in climate-controlled storage until 2009. These are not particularly strong claims, but, even if I were to assume for the sake of argument that some conduct of the state contributing to the delay was wholly unjustifiable, I cannot conclude, on balance, that the delay violated the defendant's due process rights. The state's delay was largely, if not exclusively, investigative in nature. The more sophisticated DNA technology necessary to identify the defendant as the perpetrator of the murders simply was unavailable for more than thirty years after the crimes.

In light of the weaknesses in the defendant's proof of actual and substantial prejudice when balanced against the state's legitimate justification for the delay in his prosecution, I conclude under all of the circumstances that he has failed to establish that his conviction offended "the community's sense of fair play and decency . . . ." (Citation omitted; internal quotation marks omitted.) *United States* v. *Lovasco*, supra. 431 U.S. 790.

## II

### SAARS-DOYLE'S HEARSAY STATEMENTS

I agree with the court's determination that the trial court did not abuse its discretion when it excluded from evidence the hearsay statements of the deceased witness Saars-Doyle; see part III C of the per curiam opinion; but with a caveat stemming from my agreement with the defendant's contention that the prearrest delay and hearsay issues involving Saars-Doyle's statements are not wholly disconnected. Although the trial court in the present case properly exercised its discretion to exclude the Saars-Doyle hearsay statements, trial courts faced with colorable due process concerns in this context should consider whether it is possible to exercise their discretion to admit evidence that would help mitigate the prejudice caused by the delay. See, e.g., *United States* v. *Sabath*, supra, 990 F. Supp. 1010 ("[the trial] [c]ourt attempted to explore the possibility of curing the prejudice from [the witness'] death by admitting his statements under the [catchall] hearsay exception"); see also *United States* v. *Barken*, supra, 412 F.3d 1135 (loss of documents due to prearrest delay did not cause prejudice when other available evidence served as "adequate substitutes"); *Naposki* v. *Adams*, Docket No. SA CV 16-00391 VBF (AFM), 2017 WL 907606, *9 (C.D. Cal. January 30, 2017) ("[the] defense received the benefit of the trial court's ruling permitting the defense to present [certain witnesses'] testimony, which otherwise would have been largely inadmissible hearsay, as a remedy for the [preindictment] delay"); *United States* v. *Santiago*, 987 F. Supp. 2d 465, 486 (S.D.N.Y. 2013) ("[t]o ameliorate the impact of [the witness'] unavailability, the [g]overnment . . . offered the defense the option of introducing all of [the witness'] statements—as long as all of them come in, in their entirety"); *Phillips* v. *Yates*, Docket No. 2:10-cv-1368 KJM JFM (HC), 2012 WL 2995675, *11 (E.D. Cal. July 23, 2012) ("the prejudice

caused by the loss of . . . [the] witness was mitigated by the parties' stipulation that [the] defendant's previous attorney would be permitted to testify regarding the [witness'] impeaching statements"); *People* v. *Wessels*, Docket No. D058021, 2012 WL 1293803, *9 (Cal. App. April 17, 2012) ("the prejudice to [the defendant] was mitigated because [the detective's notes memorializing his interview of a forgetful witness] were recorded and used to refresh [the detective's] recollection in many instances"), review denied, California Supreme Court, Docket No. S202655 (July 11, 2012).

To be clear, unless it is appropriate to do so as a remedial measure fashioned to cure prejudice otherwise amounting to a violation of due process, I do not suggest that plainly inadmissible evidence should nonetheless be presented to the jury as a form of "rough justice." My point is that when the evidence falls in a gray area of admissibility, one consideration that the trial court should include as part of its exercise of discretion to admit or exclude that evidence is whether, in a case in which a defendant can show prejudice resulting from prearrest delay, the interests of justice militate in favor of allowing the jury to decide for itself whether the proffered evidence, in combination with the other evidence, is sufficiently reliable to factor in its decisionmaking. After all, if Saars-Doyle had not died during the thirty-two year prearrest delay, the jury presumably would have heard her testimony, warts and all, and decided for itself to give her story whatever weight it deserved. As it happened, through no fault of the defendant, Saars-Doyle was dead by the time of trial. As a result of that fact and the trial court's decision to exclude her statements, the jury never learned from any source that there was a witness claiming firsthand knowledge who told the police that a different person, not the defendant, had committed the murders. The due process clause did not compel a different result as

a constitutional matter in this case, but a trial court operating within the scope of its discretion in making evidentiary rulings is free to take into account sub-constitutional considerations of fairness implicated when a defendant is prejudiced by the effects of a prearrest delay.